APRIL 13, 1988

No. A–792 (87–6780).   LOWENFIELD *v.* BUTLER, WARDEN. C. A. 5th Cir.   Application for stay of execution of sentence of death, presented to JUSTICE WHITE, and by him referred to the Court, denied.   JUSTICE BLACKMUN and JUSTICE STEVENS would grant the application.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Petitioner Leslie Lowenfield has been sentenced to death.   The law of the State that is about to execute him entitles him to "rais[e] at any time" the issue of his "mental incapacity to proceed" with the execution.   La. Code Crim. Proc. Ann., Art. 642 (West 1981).   See *State* v. *Perry,* 502 So. 2d 543, 564 (La. 1986). If there is a "reasonable ground to doubt" petitioner's sanity, the court "shall order a mental examination," La. Code Crim. Proc. Ann., Art. 643 (West 1981), and may permit "no further steps" in his punishment until he "is found to have the mental capacity to proceed," Art. 642.   In any event, state law affords petitioner the right to pre-execution review by a sanity commission if he can "show by a preponderance of evidence that he lacks the present capacity to undergo execution." *Perry, supra,* at 564.

Petitioner moved for review by a sanity commission, presenting evidence that he is currently insane.   The evidence consisted of a sworn affidavit by Dr. Marc L. Zimmerman, a duly licensed clinical psychologist who interviewed and tested petitioner for five hours on March 26, 1988, and concluded that "it is highly probable that Mr. Lowenfield is suffering from paranoid schizophrenia. . . . A study has found that 85% of persons who obtain the same profile as Mr. Lowenfield . . . are diagnosed as paranoid schizophrenics." App. to Pet. for Cert. 2 (citation omitted).   Dr. Zimmerman continued: "As a paranoid schizophrenic, Mr. Lowenfield's capacity to understand the death penalty would be impaired.   Indeed, my

clinical interview with Mr. Lowenfield indicated that *he is currently unable to understand the death penalty.*" *Id.*, at 3 (emphasis added). The State presented no evidence either to refute Dr. Zimmerman's conclusions or to question his credentials. In the face of that unrefuted evidence, the Louisiana trial court, and then the Louisiana Supreme Court, denied the motion without explanation.

Petitioner thereafter filed an application for habeas relief with the District Court. The District Court denied on the basis of an "extended conversation" with Dr. Zimmerman. Civ. Action No. 88–1549, p. 3 (ED La., Apr. 12, 1988). From that conversation, which the District Court conducted without any notice to petitioner's counsel and apparently before petitioner's application was filed, the District Court concluded that, contrary to Dr. Zimmerman's affidavit, "petitioner has the capacity to understand the realities of the pending execution. Petitioner, though [a] paranoid schizophrenic, is apparently able to understand that the execution is going forward in accordance with law." *Ibid.* A divided panel of the Court of Appeals affirmed in an opinion that reached this chambers a mere 15 minutes before the scheduled execution. 843 F. 2d 183 (CA5 1988).

Every court that has considered petitioner's insanity claim has made a mockery of this Court's precedent and of the most fundamental principles of ordered justice. In *Ford* v. *Wainwright*, 477 U. S. 399, 409–410 (1986), we held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." In the course of the opinion, we characterized any such execution as "'savage and inhuman,'" *id.*, at 406 (citation omitted); "'a miserable spectacle, both against Law, and of extream inhumanity and cruelty,'" *id.*, at 407 (citation omitted); "'cruel and inhumane,'" *id.*, at 408, n. 1 (citation omitted); and "abhorren[t]," *id.*, at 409.

A majority of this Court did not agree on the precise procedures that the Constitution requires when the question is raised of a prisoner's sanity for execution. A majority did, however, hold that due process demands a hearing at least once the prisoner has made some "threshold showing" that he has become insane since his trial. *Id.*, at 417 (opinion of MARSHALL, J., joined by BRENNAN, BLACKMUN, and STEVENS, JJ.); *id.*, at 426 (Powell, J., concurring in part and concurring in judgment). Justice Powell, pro-

viding a fifth vote for that proposition, stated that "[t]he State . . . may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process." *Ibid.* (footnote omitted). See also *id.*, at 429–430 (O'CONNOR, J., joined by WHITE, J., concurring in result in part and dissenting in part) (where state law prohibits execution of the insane, the State must provide a hearing).

The Louisiana Legislature has set the requisite "threshold showing" at that level of evidence that would constitute a "reasonable ground to doubt" the prisoner's sanity. La. Code Crim. Proc. Ann., Art. 643 (West 1981). It is beyond me why Dr. Zimmerman's unrefuted affidavit did not meet that threshold. For that matter, I am at a loss to explain why the affidavit, which was the sole evidence before the courts, did not establish petitioner's insanity by a preponderance of the evidence, entitling petitioner not merely to a hearing but to the relief he seeks. Neither state court furnished any explanation. In fact, neither court so much as articulated the standard it was applying. For all we know, the state courts defaulted entirely on their obligation to consider petitioner's claim. The Louisiana courts, by declining to provide any explanation for their denial of relief, as a practical matter have required petitioner to meet not "a substantial threshold showing of insanity" but an insurmountable one. The effect extends far beyond this case, for the state courts have challenged all death-row inmates to a harrowing game of Russian roulette, in which each must take a wild guess at the "threshold" or suffer the consequences. Where, as here, there is no way to discern whether the state courts' "fact-finding procedure . . . was not adequate for reaching reasonably correct results," *Townsend* v. *Sain*, 372 U. S. 293, 316 (1963), their bare denial of relief is entitled to no presumption of correctness. See 28 U. S. C. § 2254(d).

Even more outrageous was the injustice perpetrated by the federal courts to which petitioner resorted upon the state courts' default of their constitutional responsibilities. The District Court expressly adopted Dr. Zimmerman's conclusion that petitioner was a "paranoid schizophrenic." Civ. Action No. 88–1549, *supra,* at 3. That conclusion should have compelled the District Court, at the very least, to "receive evidence and argument from [petitioner's] counsel" on whether petitioner is "aware that his death is

approaching" and "perceives the connection between his crime and his punishment." *Ford, supra,* at 427, 422 (opinion of Powell, J.). Instead, the District Court excluded counsel entirely and conducted its own *ex parte* investigation in which it managed to extract from Dr. Zimmerman a concession ("Petitioner . . . is apparently able to understand that the execution is going forward in accordance with law," Civ. Action No. 88–1549, *supra,* at 3) that contradicted his sworn affidavit dated three days earlier ("[H]e is currently unable to understand the death penalty," App. to Pet. for Cert. 3). The District Court's consideration of petitioner's insanity claim fell far short of the *de novo* review that it was obliged to provide upon the state courts' default. See *Ford,* 477 U. S., at 418. Instead, its review was functionally equivalent to the "'policy of excluding all advocacy on the part of the condemned,'" which we have held unconstitutional. *Id.,* at 412–413 (citations omitted).

Worse yet, petitioner alleges—and the State does not deny— that the District Court conducted its *ex parte* investigation before it even had jurisdiction over the case; as Judge Johnson, dissenting from the Court of Appeals' judgment, observed, "the district court failed to make any finding *on* the record." 843 F. 2d, at 188. "Procedural shortcuts are always dangerous. Greater— surely not lesser—care should be taken to avoid the risk of error when its consequences are irreversible." *Autry* v. *Estelle,* 464 U. S. 1, 6 (1983) (footnote omitted).

The Court of Appeals, for its part, compounded the District Court's abuse by ignoring it entirely and proceeding to address the sufficiency of Dr. Zimmerman's affidavit as an original matter, without a proper District Court predicate. Even that determination hopelessly conflated the principles articulated in *Ford.* From Justice Powell's observation that the "State . . . *may* require a substantial threshold showing of insanity merely to trigger the hearing process," *Ford, supra,* at 426 (emphasis added), the Court of Appeals supposed that the State *must* do so, see 843 F. 2d, at 187 ("[P]etitioner has not made a substantial threshold showing"), and overlooked the State's decision to require merely a showing of a "reasonable ground to doubt" in order to trigger further examination.

The abuses and mistakes in every court that has considered this case are no doubt attributable, at least in part, to the haste with which they proceeded:

1. On the afternoon of April 11, petitioner filed in Louisiana state court a petition for postconviction relief raising the claims that are now before us.

2. Later that afternoon the state trial court denied relief.

3. At 6 p.m. (eastern daylight time) the next day, April 12, the Louisiana Supreme Court denied relief and petitioner applied to the District Court for a writ of habeas corpus. 843 F. 2d, at 184–185.

4. At 8:30 p.m. the District Court denied petitioner's application. *Id.*, at 185.

5. At 12:10 a.m. that same night the Court of Appeals affirmed.

6. At 12:45 a.m. (15 minutes before the scheduled execution) the Court of Appeals' opinions were circulated to this Court.

7. At 1:05 a.m., with petitioner already strapped in the electric chair, this Court denied his application for a stay of execution.

8. At 1:25 a.m. petitioner was pronounced dead. N. Y. Times, Apr. 14, 1988, p. A28, col. 1. Time ran out before we voted on the certiorari petition that accompanied petitioner's stay application.

The haste that attended disposition of this case is reprehensible. It is hardly surprising that a case scudding through the state courts in 24 hours should yield orders devoid of law or logic—the ones in this case simply read, "DENIED"—for which the description "terse" would be charitable. If the federal courts are intent on accelerating the pace at any cost, as they were in this case, their only choice is to take procedural shortcuts and give short shrift to substance. And simple arithmetic suggests grave injustice when the Court of last resort takes 15 minutes to read and analyze 17 pages of opinions from the court below and cast a vote on life or death.

Due process means little if it requires the courts to provide an "opportunity to be heard," *Grannis* v. *Ordean*, 234 U. S. 385, 394 (1914), without imposing on them a concomitant duty to listen—and, at least when a life is at stake, to listen very carefully. Pre-

sumably, it was in recognition of the injustice that four of us (one less than the requisite five) voted to stay petitioner's execution, so as to consider his insanity claim in an atmosphere that was not itself lunatic.

Regrettably, this case is not atypical. It is the natural product of a penal system conducive to inaccurate factfinding and shoddy analysis. And I doubt that any system could be devised to cure the evil, so long as States continue to impose punishments so severe as to be irrevocable. Even were I not convinced that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth Amendment, see *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976) (dissenting opinion), I would have no part of a penal system that permits a State's interest in meting out death on schedule to convert our constitutional duty to dispense justice into a license to dispense with it.

I dissent.