[No. 56205-9. En Banc. March 29, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. BENJAMIN JAMES HARRIS III, *Petitioner*.

*Browne & Ressler,* by *Allen M. Ressler,* for petitioner.

*John W. Ladenburg, Prosecuting Attorney,* and *Chris Quinn–Brintnall, Senior Appellate Deputy,* for respondent.

*James E. Lobsenz* on behalf of Washington Association of Criminal Defense Lawyers; *David J. Burman, Valerie L. Hughes,* and *Kevin J. Hamilton* on behalf of American Civil Liberties Union, amici curiae for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *John M. Jones* and *Paul D. Weisser, Assistants; Robert S. Lasnik* on behalf of Washington Association of Prosecuting Attorneys, amici curiae for respondent.

DOLLIVER, J.—Following its June 29, 1989, en banc administrative conference, this court granted Benjamin Harris' motion for discretionary review of the warrant setting his execution for July 11, 1989. In the order granting review, the court acknowledged that Harris' motion for stay of execution had become moot by a federal stay order. We observed, however, that his claim of incompetency to be executed may not be moot and presents "important questions which should be determined for the guidance of trial courts in this and other capital cases." We now answer those questions and deny Harris' request for additional inquiry into his mental state.

On August 10, 1984, the Pierce County Prosecutor charged Harris and Gregory Bonds with the aggravated first degree murder of Jimmy Lee Turner. The prosecutor alleged Harris had agreed to pay Bonds to commit the murder. In late September, Harris was committed to Western State Hospital for a determination of his competency to stand trial. On October 10, 1984, the hospital reported Harris was aware of the nature of the charges against him and able to assist in his defense. The trial court granted defense counsel's motions for a continuance and for an independent psychiatric examination. Counsel evidently did not obtain an independent evaluation, and no formal

evidentiary hearing was held on Harris' mental state prior to trial.

Following Harris' conviction on the aggravated murder charge, defense counsel moved for arrest of judgment and for a new trial. Counsel claimed Dr. Kathleen Mayers, the clinical psychologist who had examined and tested Harris at Western State, had not completed scoring one of the tests. At the hearing on this motion, Dr. Mayers adhered to her opinion that Harris had been competent to stand trial. She also explained the one test had not been scored because Harris never finished taking it. Dr. Allen Traywick, who had also examined Harris at Western State, agreed with Dr. Mayers' assessment of Harris' mental state. The trial court denied the motion for new trial and entered judgment on the jury's verdict. Harris' conviction and death sentence were affirmed in October 1986. *State v. Harris,* 106 Wn.2d 784, 725 P.2d 975 (1986), *cert. denied,* 480 U.S. 940 (1987).

In his first personal restraint petition, Harris framed 36 separate issues, including a claim that he had been incompetent to stand trial. That petition was denied in November 1988. *In re Harris,* 111 Wn.2d 691, 763 P.2d 823 (1988). Defense counsel Allen Ressler subsequently filed a second personal restraint petition and requested this court to authorize an expenditure of public funds to enable Dr. Kenneth Muscatel to examine Harris and determine his competency to be executed and his ability to assist counsel in postconviction proceedings. Following our March 8, 1989, en banc administrative conference, we dismissed Harris' second personal restraint petition without prejudice and granted the motion for expenditure of public funds for the psychiatric examination.

On May 22, 1989, Deputy Prosecutor Chris Quinn–Brintnall informed Ressler by telephone that she had scheduled a May 30 hearing to present the death warrant. Ressler replied that Dr. Muscatel had completed the competency evaluation this court had authorized. The prosecutor suggested that the competency hearing also be held on

the 30th. When Ressler asked if the State could be ready that fast, the prosecutor said she would make the necessary arrangements and get back to him. Ressler said he had no objection to having a State expert examine Harris, but he wanted to see the court order first so he would know when the examination was to occur. Following this telephone conversation, Quinn–Brintnall obtained an ex parte order transferring Harris to Western State Hospital for a competency evaluation. She then telephoned Ressler's office and left notice of the date of the scheduled examination (then 3 days hence). Ressler was not in the office the rest of the week, however, and did not learn until after the fact that Harris had been transferred to Western State and examined there.

At the outset of the May 30 hearing, Ressler said he was "not sure what the purpose of this appearance before the Court is today" and that he "wasn't even aware of why I was coming to court today." He complained that the prosecutor had "never moved the court for an order setting a new execution date." Ressler conceded that he had been informed in a telephone conversation the previous Monday (May 22) that there would be a hearing on the 30th. He said he understood that "what counsel wants to do is to have an execution date." He also acknowledged he "ha[d] planned to put the issue of competency in question this morning" and that "I'm here with my witnesses."

The trial court asked Ressler what he was "trying to accomplish with this argument . . .". Ressler replied that he wanted the court "to determine that my client is incompetent to proceed with any of these additional proceedings." The court asked if counsel wanted "to do that today?" Ressler said he wanted to present his evidence, but he objected to Harris' ex parte examination at Western State and moved to strike the State's expert testimony. After telling Ressler the State had the right to present evidence if he did so, the court again asked counsel if he wanted to "proceed today or not?" Ressler said he did not, and suggested a hearing at the end of the week.

The court indicated its willingness to grant a 1– or 2–day continuance and suggested the State could, in the interim, "redo" its expert's examination of Harris with proper notice to counsel. Later, however, the court suggested that they proceed that day with Dr. Muscatel's testimony and "see if it raises a question regarding Mr. Harris' competency." The court asked Ressler if this procedure would be satisfactory. Ressler said the court could make a determination of incompetency based solely on Dr. Muscatel's written report. The court proposed instead to "listen to Mr. Ressler's evidence" since Dr. Muscatel and Harris were both present.

Ressler then called Dr. Muscatel, who testified that he had interviewed Harris in the mental health unit of the penitentiary. In his written report to counsel, Muscatel had concluded that "Although [Harris] is able to appreciate his circumstances and his peril . . . there is reason for substantial concern for this man's competence to assist his attorney in the current aspects of his appeals." When Muscatel began testifying regarding Harris' "competency with regards to his assisting his attorney . . . [i]n the appeal process", the court informed Ressler that "we are only concerned here with competency . . . for the purposes of execution, death warrant. I am not, in this court, concerned with his competency for the appeal process . . .". Ressler asked to make a record on both issues and moved for admission of Muscatel's written report as exhibit A. The court sustained the prosecutor's objection to the exhibit as irrelevant but expressed willingness to "hear anything you wish to offer . . . as to whether or not he is sufficiently competent for this Court to sign a death warrant."

Ressler then asked Muscatel if he was able to render an opinion regarding a person's competence to be put to death. Muscatel replied that it was difficult to do so because there is no clear legal standard defining this type of competency. The doctor said he had recently been to a national conference on the issue and had heard of several different standards. He could recall only the Kentucky test, under which

a defendant is competent to be executed if he is not experiencing an acute psychotic episode. According to Muscatel, Harris was not having an acute psychotic episode; he understands "the nuts and bolts" of the legal proceedings; he knows he is facing execution for his murder conviction. Because of his "delusional system", however, Harris is "unconcerned about it because he believes that he will be exonerated and set free before anything happens".

When the court asked directly whether Harris is competent enough for the court to sign a death warrant, Muscatel replied, "I don't know if he's competent or not . . .". Ressler asked whether there was anything he could do that would enable him to render an opinion on that issue. Muscatel first replied, "If he's always the way he is right now, today, I may never know." When Ressler repeated the question, however, the doctor said, "The only thing I could do is spend more time with him." On cross examination, Muscatel conceded that he might not be able to "make a clear judgment" even after seeing Harris two or three more times.

At the completion of Dr. Muscatel's testimony, Ressler moved "to strike these proceedings and for the Court to enter an order determining that [Harris] is incompetent to proceed and to stay all further proceedings pending his being rendered competent". Counsel suggested that Harris be evaluated under RCW 10.77 over the next 3 weeks, after which Dr. Muscatel could return to court and render an opinion regarding Harris' competence.

The trial court found no reason to doubt Harris' competence to be executed, denied the motion for stay, and signed the death warrant. The court did not make any finding regarding Harris' ability to assist counsel in post-conviction proceedings.

Ressler then filed both a federal habeas corpus petition and a timely "notice of appeal" from the death warrant. Apparently aware the warrant might not be considered appealable, see State v. Campbell, 112 Wn.2d 186, 190, 770 P.2d 620 (1989), counsel requested that the notice of appeal

be treated as either a motion for discretionary review or a personal restraint petition. The federal court stayed Harris' execution on June 22, 1989, and has since stayed consideration of his habeas corpus petition pending this court's resolution of the competency issue.

## I

As we observed in the order granting review, Harris' argument regarding competency to be executed raises several important questions which should be resolved for the guidance of trial courts in all capital cases. We consider first the issue of what is the proper definition of competency to be executed.

In holding in *Ford v. Wainwright,* 477 U.S. 399, 417, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986) that the Eighth Amendment bars execution of the "insane", the 4–Justice plurality described "insanity" as a mental illness which prevents the condemned "from comprehending the reasons for the penalty or its implications." This test, which required only that the "defendant perceive[] the connection between his crime and his punishment," *Ford v. Wainwright, supra* at 422 (Powell, J., concurring in part and concurring in judgment), is applied in Florida, Georgia and Illinois. Fla. Stat. § 922.07 (1985); Fla. R. Crim. P. 3.811(b) (1989); Ga. Code Ann. § 17–10–60 (Supp. 1989); Ill. Ann. Stat. ch. 38, ¶ 1005–2–3 (Smith–Hurd 1982). *See also Ex parte Jordan,* 758 S.W.2d 250 (Tex. Crim. App. 1988) (upholding trial court's application of this definition, which defendant did not challenge).

In his concurrence, Justice Powell found this definition to be consistent with the "Eighth Amendment[, which] forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Ford v. Wainwright, supra* at 422 (Powell, J., concurring). He noted, however, that the states are free to adopt "a more expansive view of sanity" which includes the "requirement that the defendant be able to assist in his own defense." *Ford v. Wainwright, supra* at 422 n.3 (Powell, J., concurring). This latter concept is taken from

Blackstone's Commentaries (4 W. Blackstone, *Commentaries* (1769)) and has been adopted by statute or case law in several jurisdictions. *Ford v. Wainwright, supra* at 422 n.3 (Powell, J., concurring) (citing Miss. Code Ann. § 99–19–57(2)(b) (Supp. 1985); Mo. Rev. Stat. § 552.060(1) (1978); Utah Code Ann. § 77–15–2 (1982); 24 C.J.S. *Criminal Law* § 1619 (1961)).

Following *Ford,* a majority of the Justices expressed agreement with Justice Powell that the Eighth Amendment bars execution only of prisoners who are insane in the sense of being "'unaware of the punishment they are about to suffer and why they are to suffer it'." *Penry v. Lynaugh,* ___ U.S. ___, 106 L. Ed. 2d 256, 109 S. Ct. 2934, 2954 (1989) (opinion of the Court on this issue) (quoting *Ford v. Wainwright, supra* at 422 (Powell, J., concurring)). Thus, adoption of the broader "ability to assist" test, or any other definition of competency to be executed in this state, must be based on the common law or the Washington State Constitution, not the Eighth Amendment.

This court has articulated several different tests for determining whether a defendant has sufficient mental capacity to be executed. *Grossi v. Long,* 136 Wash. 133, 134, 238 P. 983 (1925) held the defendant could not be executed because he was "incapable of understanding his situation or understanding that he was about to face execution for the crime of which he was convicted." *State v. Nordstrom,* 21 Wash. 403, 409, 58 P. 248 (1899), *aff'd,* 181 U.S. 616, 45 L. Ed. 1029, 21 S. Ct. 925 (1901), by contrast, held the trial judge was "clearly justified" in finding the defendant was sufficiently sane to be executed because a panel of experts determined he was "capable of distinguishing between right and wrong". *State v. Nordstrom, supra* at 404. In *State v. Davis,* 6 Wn.2d 696, 717, 108 P.2d 641 (1940), we said a defendant who is "insane" may not be executed but did not further define the term "insanity".

Most recently, relying on cases involving competency to stand trial, we held a defendant is competent to be executed if he "is capable of properly appreciating his peril

and of rationally assisting in his own defense [and] that this standard [ability to assist] applies equally in the context of a person's insanity at the time of punishment as it does at the time of trial." *State v. Rice,* 110 Wn.2d 577, 621, 757 P.2d 889 (1988) (quoting and citing *State v. Henke,* 196 Wash. 185, 193, 82 P.2d 544 (1938) and *State v. Ortiz,* 104 Wn.2d 479, 482, 706 P.2d 1069, *cert. denied,* 476 U.S. 1144 (1986) (both noncapital cases)). Although we have set the standard and confirmed it in *Rice,* we must analyze its meaning in order to apply it to the matter before us. This we now do.

In *State v. Wicklund,* 96 Wn.2d 798, 800, 638 P.2d 1241 (1982), we held a defendant must be "capable of rationally assisting his legal counsel in the defense of his cause." We have also held the defendant's ability to "relate past events which would be useful in assisting his attorney" in whatever defense counsel decides is appropriate is an important consideration in determining his competency to stand trial. *State v. Ortiz, supra* at 483; *see also State v. Gwaltney,* 77 Wn.2d 906, 908, 468 P.2d 433 (1970) (reversing finding of incompetence largely because defendant's "memory of the event remains intact").

The defendant need not be able to "suggest a particular trial strategy", however, or to "choose among alternative defenses". *State v. Ortiz, supra* at 483; *State v. Hahn,* 106 Wn.2d 885, 726 P.2d 25 (1986). Nor does inability to recall past events necessarily constitute incompetence. For example, many courts have held or acknowledged that amnesia does not necessarily constitute incompetence. *See* Annot., *Amnesia as Affecting Capacity To Commit Crime or Stand Trial,* 46 A.L.R.3d 544 (1972 & Supp. 1989). On review of competency findings in amnesia cases, these courts generally examined the facts of the particular case to determine whether the defendants' inability to recall events surrounding the crime affected their right to a fair trial. The strength of the State's case, the existence of physical evidence linking the defendant with the crime, and the availability of other defense witnesses are viewed as indications

that the defendant's recollection of the events was not critical to a fair trial. *E.g., United States ex rel. Parson v. Anderson,* 481 F.2d 94 (3d Cir.), *cert. denied,* 414 U.S. 1072 (1973).

State and federal courts have also upheld findings of competency despite the defendant's diagnosed schizophrenia (a term which includes paranoia, manic–depressive disorder, and what used to be called dementia praecox). *See* Annot., *Competency To Stand Trial of Criminal Defendant Diagnosed as "Schizophrenic"—Modern State Cases,* 33 A.L.R.4th 1062 (1984); Annot., *Competency To Stand Trial of Criminal Defendant Diagnosed as "Schizophrenic"—Modern Federal Cases,* 63 A.L.R. Fed. 696 (1983). For example, in *White v. Estelle,* 669 F.2d 973 (5th Cir. 1982), defense experts testified the defendant suffered from hallucinations, could not differentiate reality from fantasy, and was unable to consult with counsel though he could understand the murder charge against him. The State's experts did not express an opinion as to the defendant's competence, but said only his brain damage, if any, was minimal. The federal court upheld a finding of competence based on testimony of the sheriff and jailers to the effect that the defendant behaved like other prisoners and appeared to communicate normally with his attorney.

 As these cases demonstrate, "ability to assist," even at trial, is a minimal requirement. Application of the same standard once the conviction is final must recognize this fact, as well as the lessened need for a defendant to assist in postconviction proceedings, the availability of both state and federal collateral review of trial errors, and the expansion of the right to competent counsel at trial. *See Ford v. Wainwright, supra* at 422 n.3 (Powell, J., concurring) (noting that the common law standard for competence to be executed antedates the recent expansion of both the right to counsel and the availability of postconviction relief). Thus, to be "able to assist" in postconviction proceedings, the defendants need not be able to think of new issues for counsel to raise, nor must they necessarily be able to recall

the events surrounding the crime. What is required is that they understand they have been sentenced to death for murder and be able to communicate rationally with counsel. We believe this rule preserves the due process rights of defendants and the fairness which the imposition of the death penalty, particularly, demands. It will also protect the interests of the State and its citizens in finality and in avoiding repetitive collateral review. *See Ford v. Wainwright, supra* at 421 n.2 (Powell, J., concurring).

We now apply this "able to assist" rule to the case at hand. In his initial request for appointment of an expert, Harris' attorney said only:

> On Tuesday, November 29, 1988, I met with petitioner at the Washington State Penitentiary at Walla Walla.
>
> As a result of my conversations and discussions with petitioner I have serious doubts that he is competent and capable of understanding and/or assisting in these proceedings or in any future proceedings.

Dr. Muscatel subsequently found "reason for substantial concern for this man's competence to assist his attorney in the current aspects of his appeals." The doctor also described the delusional thought processes which he believes undermine Harris' ability to assist Ressler in presenting collateral claims. Ressler's own more recent affidavits express similar concerns that Harris is unable to assist him in preparing the various postconviction proceedings. In a June 20, 1989, letter requesting this court to decide his personal restraint petition, Harris claimed that he had been suffering from "amnesia as far as some very, very, important sequences of time in some parts of what happened the Night that Gregory Bonds Shot Jimmie Turner . . .". Harris also claimed just recently to have recalled seeing his trial counsel with "some very, very, very, members of the Ku Klux Klan as well as other enomies [*sic*] of mine" sometime before trial. Before and during trial, Harris admitted that he and Bonds had each shot Turner but claimed there was no contract for the killing. Harris now apparently claims that he falsely confessed to the shooting

because of "memory problems" and counsel's improper influence.

Harris, Ressler, and Dr. Muscatel all appeared at an adversarial judicial proceeding to determine Harris' mental state. Although the State presented no evidence at this hearing, there is no suggestion defense counsel would have been precluded from cross–examining any witnesses the State chose to call. To the contrary, the trial court indicated that the hearing would be delayed for a day or two, if Muscatel's testimony raised a substantial question as to Harris' competency, so the State could "redo" its expert's examination of Harris in defense counsel's presence. The implication of this suggestion was that the State's expert testimony would have been offered in a continuation of the adversarial proceeding.

As Harris notes, counsel was not provided with written notice of the May 30 hearing. Nevertheless, the prosecutor informed him of the hearing and its purpose in a May 22 telephone conversation. Counsel does not explain how this telephonic notice was insufficient to apprise him of the date, time, or purpose of the hearing. Counsel came to the hearing prepared to present Dr. Muscatel's report on the competency issue and to call the doctor as a witness. Counsel was also aware the State would be presenting a death warrant for the court's signature. Perhaps most importantly, the competency issue must be raised on the defendant's motion, and he has the burden of proof on that issue. *E.g., Ford v. Wainwright, supra.* Thus, under ordinary motion practice, defense counsel should have noted the competency motion rather than complaining of the prosecutor's failure to do so. *See* CrR 8.2, CR 7(b).

Harris is also concerned that the order directing his examination at Western State was obtained ex parte. It is inexplicable that the prosecutor obtained an ex parte order, particularly after counsel specifically requested to be informed of the examination so he could be present. Nonetheless, the results of the examination were not admitted against Harris at the trial court level, nor have they been

made part of the record on appeal. Also, the trial court agreed a second examination should be ordered, with proper notice, if Harris' own expert raised a material issue as to his competency. Any error in obtaining the ex parte order was therefore harmless.

Despite the State's failure to provide defense counsel with written notice of the Western State evaluation and the May 30 hearing, the procedures followed here were not constitutionally infirm. The more difficult question is whether the evidence counsel presented at that hearing rebutted the presumption of Harris' competence (or "sanity").

■ The trial court did not evaluate Dr. Muscatel's testimony under a correct definition of sanity or competency to be executed. It did not apply either Blackstone's "ability to assist" test, which this court adopted in *Rice*, or the narrower test the Supreme Court adopted in *Ford*. Nevertheless, we do not believe Harris has met his burden of proving his incompetency under any definition of that term. Even according to Dr. Muscatel, although Harris had delusional hope in his ultimate exoneration, he is not having an acute psychotic episode, he understands "the nuts and bolts" of the legal proceedings, and he knows he is facing execution for his murder conviction. This testimony supports a finding that Harris meets both the *Ford* definition of sanity and the broader "ability to assist" test of *Rice*. The most Dr. Muscatel could say was "there is reason for substantial concern for this man's competence to assist his attorney in the current aspects of his appeals." When the court asked directly whether Harris is competent enough for the court to sign a death warrant, Muscatel replied, "I don't know if he's competent or not . . .". In response to additional questions, Muscatel said he "may never know" if Harris is competent, and "[t]he only thing I could do is spend more time with him." This testimony is very similar to the expert testimony the Fifth Circuit found insufficient even to warrant an evidentiary hearing in *Lowenfield v. Butler*, 843 F.2d 183 (5th Cir. 1988).

Even though it made no formal written finding as to competency, we affirm the trial court's oral finding that Harris is competent to be executed. The evidence Harris presented is not a substantial showing of his incompetency under either federal or state law.

## II

Although this ruling is dispositive of this case, since questions of competency doubtless will arise again in capital cases, we take this opportunity to discuss the procedures to be followed when the mental state of a condemned prisoner is questioned. Several issues must be considered including (a) preliminary substantial showing of incompetency, (b) forum for a claim of incompetency, (c) venue, (d) evidentiary hearing, (e) form of decision, and (f) appellate review.

(a) Preliminary substantial showing of incompetency. (For purposes of this discussion, we will assume all proceedings concerning postconviction competency shall be in Superior Court. Further discussion of this issue will be under (b) below.) The plurality and concurring Justices in *Ford* agreed that a hearing as to competency is required only where defendants make a "high threshold showing" their sanity to be executed is genuinely in issue. *See Ford v. Wainwright,* 477 U.S. 399, 417, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986) (plurality opinion) (citing *Pate v. Robinson,* 383 U.S. 375, 387, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966)); *see also Ford v. Wainwright, supra* at 426 (Powell, J., concurring). Neither the plurality opinion of Justice Marshall nor the concurring opinion specifies the precise limits of the "high threshold showing", however, leaving that task to the states.

In *Ake v. Oklahoma,* 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985), cited by Justice Powell in *Ford,* the Supreme Court set forth the due process standards to be applied by the states regarding the appointment of a defense psychiatrist for an indigent capital defendant. In *Ake,* the Court placed the burden on the defendant to make a substantial showing that the defendant's insanity

was "seriously in question" and would be "a significant factor at trial" before due process required appointment of a defense psychiatrist. *Ake v. Oklahoma, supra* at 82–83.

Courts which have applied *Ake* have further refined its threshold showing requirement, stating that "the showing must be clear and genuine, one that constitutes a 'close' question . . .". *Cartwright v. Maynard,* 802 F.2d 1203, 1211 (10th Cir. 1986). The defense must articulate a *factual* basis demonstrating that a defense psychiatrist is necessary to the defense; this requires more than mere "naked demands" for a defense psychiatrist. *Messer v. Kemp,* 831 F.2d 946, 964 (11th Cir. 1987), *cert. denied sub nom. Messer v. Zant,* 485 U.S. 1029 (1988).

The threshold standard in *Ake* is lower than the standard to be applied in posttrial sanity inquiries.

> Unlike the defendant Ake, who was presumed innocent, the prisoner here has been found guilty, and, moreover, is presumed sane. The state in this situation has already provided a full trial, a procedure that was not yet provided to Ake. These factors indicate that due process may allow a higher threshold showing than that explained in Ake.

*Martin v. Dugger,* 686 F. Supp. 1523, 1561 (S.D. Fla. 1988).

In *Johnson v. Cabana,* 818 F.2d 333, 337–38 (5th Cir.), *cert. denied,* 481 U.S. 1061 (1987), the federal court upheld the state court's refusal to order an evidentiary hearing where counsel had offered expert affidavit testimony that the prisoner suffered from brain dysfunction and appeared to be unable to appreciate fully his situation. In upholding the state court the Court of Appeals noted the expert had said only that "Johnson's present condition '*may*' impair his relations with his counsel" and held that this evidence "does not come close to establishing" Johnson's insanity or incompetence to be executed. *Johnson,* at 340.

The Fifth Circuit again found an insufficient threshold showing to require an evidentiary hearing in *Lowenfield v. Butler,* 843 F.2d 183 (5th Cir.), *cert. denied,* 485 U.S. 1014 (1988). The defense expert there submitted an affidavit describing his preliminary diagnosis that the defendant was suffering from paranoid schizophrenia and "is currently

unable to understand the death penalty." *Lowenfield,* at 187. The doctor said it was essential that a further evaluation be conducted. The Fifth Circuit found this evidence to be "woefully" insufficient to constitute a "substantial threshold showing" of insanity so as to trigger the *Ford* hearing requirement. *Lowenfield,* at 187; *see Lowenfield v. Butler,* 485 U.S. 995, 99 L. Ed. 2d 686, 108 S. Ct. 1456 (1988) (denying motion for stay pending certiorari).

The rationale underlying the *Ford* substantial threshold requirement is twofold. First, death penalty litigation is fraught with the potential for false claims and deliberate delay. *See, e.g., Woodard v. Hutchins,* 464 U.S. 377, 380, 78 L. Ed. 2d 541, 104 S. Ct. 752, 753 (1984) ("A pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent."). The death row inmate has an obvious incentive to make a last–minute claim of insanity. Without a substantial threshold requirement, the eleventh hour petitions asserting insanity would be encouraged because the death row petitioner would know that the mere filing of a conclusory petition would result in a stay of execution. Placing no initial burden on the petitioner is an invitation to specious insanity claims.

Second, the issue of insanity can be repeatedly litigated by the same petitioner.

> By definition, [insanity] can *never* be conclusively and finally determined: Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary.

*Ford v. Wainwright, supra* at 429 (O'Connor, J., concurring in the result in part, dissenting in part).

 Therefore, the rule we adopt places the burden on the petitioners to make a substantial showing that they are presently insane for purposes of execution. Only if petitioners make such a showing are they entitled to an evidentiary hearing. This threshold burden may be met by the

submission of affidavits, depositions, medical reports or other credible evidence sufficient to demonstrate that there exists a genuine question regarding petitioner's present sanity. Ordinarily the affidavits, depositions, or medical reports submitted with the petitioner's motion for an evidentiary hearing would be from psychiatrists, psychologists, or other mental health professionals.

This procedure is analogous to the manner in which other disputed factual issues are treated in personal restraint proceedings and superior court motion procedures. A personal restraint petition is required only to contain a description of the evidence upon which the petitioner's claim of unlawful restraint is premised. RAP 16.7(a). An evidentiary hearing will be ordered if the pleadings raise a prima facie issue of constitutional error which cannot be resolved on the existing record. RAP 16.11(b); *In re Williams*, 111 Wn.2d 353, 365, 759 P.2d 436 (1988). Similarly, a civil litigant can successfully resist a motion for summary judgment if his affidavits and other submissions raise a genuine issue of material fact. CR 56(c). Applying these principles to a defendant who claims to be incompetent to be executed would require the court to hold an evidentiary hearing if competent evidence is submitted which raises a triable issue of incompetence or insanity.

If the court is satisfied there exists a genuine, disputed issue regarding petitioner's present sanity, then an adversarial hearing should be held in superior court. The court should ensure that both petitioner's counsel and counsel for the State are given proper notice of the nature of the hearing, *i.e.*, that the parties should be prepared to present their witnesses' testimony and other evidence, as well as to cross-examine the opposing party's witnesses.

If the court determines that petitioner's showing does not satisfy the burden, the court should enter an appropriate order, supported by detailed findings of fact, denying the motion for a hearing.

(b) Forum for a claim of incompetency. The *Ford* Court left to the states the task of developing procedures to protect the newly created Eighth Amendment right. *Ford v.*

*Wainwright, supra* at 416 (plurality opinion). Thus, we must determine where petitioners, such as Harris, are to bring their claims. While not prohibiting an administrative forum, it is clear that *Ford* requires eventual judicial review. *Ford v. Wainwright, supra* at 416. The procedure in Florida was specifically criticized, *inter alia,* for being maintained wholly within the executive branch. *Ford v. Wainwright, supra* at 416.

In his motion for discretionary review, Harris argued that the competency examination and hearing procedures set forth in RCW 10.77 should govern competency hearings at this juncture as well. This argument is not persuasive. The procedures set forth in RCW 10.77 were not designed to apply following conviction. If a defendant is found "incompetent" in a hearing conducted under RCW 10.77.060, the trial court is to stay the proceedings for a period not exceeding 90 days. RCW 10.77.090(1). At the end of that period, the court must conduct a second hearing, after which the stay may be extended for another 90 days. RCW 10.77.090(2). If the defendant remains "incompetent" at the end of this period, either "the charges shall be dismissed without prejudice" and civil commitment proceedings initiated, or, if the defendant is clearly dangerous, the trial court may order an additional 6 months' commitment. RCW 10.77.090(3). Clearly, these procedures were intended to apply to defendants facing criminal charges, not to those already convicted. *See In re Hews,* 108 Wn.2d 579, 588, 741 P.2d 983 (1987) (incompetent personal restraint petitioner not subject to RCW 10.77).

Although the RCW 10.77 procedures do not apply in this context and Washington has no administrative procedure for determining claims of incompetency to be executed, petitioners such as Harris have not been left without a remedy. We have held Washington state courts possess inherent authority to grant a stay of execution upon a showing of intervening insanity. *State v. Davis,* 6 Wn.2d 696, 717, 108 P.2d 641 (1940). This power is independent of any statutory authority. *State v. Davis, supra.* Thus, in the

absence of an administrative forum for determining petitioner's sanity, Harris properly raised the issue in Superior Court.

Deciding the issue in a judicial forum will also limit later federal intervention. It is a fact of life in modern day capital litigation that those offenders sentenced to death routinely press their claims in federal court, pursuant to 28 U.S.C. § 2254, after exhausting their state court remedies. In such federal habeas proceedings, an "evidentiary hearing is required unless the state–court trier of fact has after a full hearing reliably found the relevant facts." *Townsend v. Sain,* 372 U.S. 293, 312–13, 9 L. Ed. 2d 770, 83 S. Ct. 745 (1963).

The availability of state court findings of fact will relieve the federal court of the necessity of holding an evidentiary hearing, thereby allowing speedy resolution of *Ford* claims by a federal habeas court. Even more importantly, factual determinations made by state trial or appellate courts, after a full, fair and adequate hearing, must be presumed correct in a subsequent federal habeas proceeding. *Sumner v. Mata,* 449 U.S. 539, 544–46, 66 L. Ed. 2d 722, 101 S. Ct. 764 (1981); 28 U.S.C. § 2254(d).

(c) Venue. The statutory capital sentencing and review scheme has given exclusive jurisdiction to try capital defendants to the superior courts and exclusive appellate review jurisdiction of such cases to this court. *See* RCW 10.95. The superior court, as the trial level court in capital cases, is best suited to engage in the fact–finding process necessary to determine claims including a capital defendant's mental state. Although two superior courts could logically have jurisdiction over petitioner's claim—the superior court which originally tried petitioner and rendered sentence or the superior court for the county wherein petitioner is presently located—we believe the superior court where petitioner was sentenced has several advantages over any other court.

That court is already intimately familiar with the petitioner and the facts of the case, including petitioner's

courtroom demeanor, after presiding over trial and sentencing. All the records from the case are located within the sentencing court clerk's files, including records regarding previous insanity claims. This is also the county where the prosecutor who tried the case resides and where petitioner's attorney may practice or reside.

The disadvantages of the alternative only enhance the selection of the sentencing court. All prisoners sentenced to death are housed at the Washington State Penitentiary in Walla Walla County. *See* RCW 10.95.170. However, the Walla Walla County Superior Court is a small court with only two Judges. None of the records from petitioner's trial or prior competency evaluations are located in Walla Walla County. Further, neither of the two Walla Walla County Superior Court Judges will be familiar with the facts of petitioner's case. We believe the best suited judicial forum for determining petitioner's claim is the superior court which originally tried and sentenced him.

(d) Evidentiary hearing. If the court determines the petitioner's initial burden has been met, an evidentiary hearing must be held unless the prosecutor concedes the issue.

*Ford* made it clear the requirements of due process must apply to any hearing process used to determine a petitioner's sanity. *Ford v. Wainwright, supra* at 414 (plurality opinion). As an initial matter, petitioner must be given notice that an evidentiary hearing will be held. *Martin v. Dugger,* 686 F. Supp. 1523, 1562 (S.D. Fla. 1988); *Goss v. Lopez,* 419 U.S. 565, 578–79, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313–14, 94 L. Ed. 865, 70 S. Ct. 652 (1950).

The notice given must be sufficient to afford the petitioner an adequate opportunity to be heard. *Ford v. Wainwright, supra* at 414 (plurality opinion); *Martin v. Dugger, supra* at 1562; *Grannis v. Ordean,* 234 U.S. 385, 58 L. Ed. 1363, 34 S. Ct. 779 (1914). Any procedure that unreasonably precludes petitioner from attending and "presenting material relevant to [the question of] his sanity or bars consideration of that material by the factfinder is necessarily inadequate." *Ford,* at 414 (plurality opinion). Not only

does due process require petitioner be given notice of the scheduling of an evidentiary hearing, the notice given must be sufficient for petitioner's case to be presented through the submission of relevant evidence.

Though the evidentiary hearing is not required to be a "full scale 'sanity trial'", it must be adversarial in nature. *Ford,* at 425 (Powell, J., concurring). The defendant must be given the opportunity to present "evidence and argument . . . including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Ford,* at 427 (Powell, J., concurring). Further, the Court was adamant that "[c]ross–examination . . . or perhaps a less formal equivalent" is necessary to evaluate the various, often conflicting, opinions of the experts. *Ford,* at 415 (plurality opinion).

To summarize: Due process requires the petitioner be given reasonable notice if an evidentiary hearing is to be held; the petitioner needs to be present at such hearing and represented by counsel; the hearing will be adversarial in nature; and the petitioner will be allowed to present all material, relevant evidence necessary to overcome the strong presumption of sanity.

(e) <u>Form of decision</u>. The Superior Court's conclusion regarding the petitioner's sanity, although based upon expert medical and psychological testimony, will be a finding of fact. *See Ford,* at 412 (plurality opinion) ("the ultimate decision will turn on the finding of a single fact . . ."); *cf. Maggio v. Fulford,* 462 U.S. 111, 76 L. Ed. 2d 794, 103 S. Ct. 2261 (1983) (competency to stand trial is a question of fact). The issue of the petitioner's sanity "does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." *Miller v. Fenton,* 474 U.S. 104, 113, 88 L. Ed. 2d 405, 106 S. Ct. 445 (1985); *see also Evans v. Raines,* 800 F.2d 884, 887 (9th Cir. 1986). The issue "depends substantially on expert analysis in a discipline fraught with 'subtleties and nuances.'" *Ford,* at 426 (Powell, J., concurring). The court will be required to

assess the credibility of expert witnesses and their conflicting opinions. *Miller v. Fenton, supra* at 114. All of these concerns point to the factual nature of the issue presented.

To ensure proper state appellate and federal habeas corpus review of the court's decision, the court should prepare detailed written findings of fact. *Cf.* CrR 3.5(c); CrR 3.6. *See* 28 U.S.C. § 2254(d). The court's resolution of the undisputed and the disputed facts will determine whether a petitioner is entitled to a stay of execution.

(f) Appellate review. The petitioner and the State both have an interest in guarding against erroneous determinations of the issue of petitioner's insanity. The State has the additional interest of seeing that the lawful decisions of capital sentencing juries are carried out. Therefore, there should be a discretionary review mechanism whereby the Superior Court's conclusion may be reviewed for error, and it is appropriate that this court review such cases directly. RAP 4.2(a)(6); *see, e.g., State v. Campbell,* 112 Wn.2d 186, 770 P.2d 620 (1989). This court should expedite appellate review of *Ford* claims due to the urgency created by the pending execution date. RAP 18.8(a) allows the court to shorten the time within which the parties may file their briefs and present oral argument.

Procedural error (*e.g.,* lack of proper notice) should be reviewed as a question of law. However, the court's findings of fact on disputed facts, including the court's ultimate finding on petitioner's sanity or insanity, would not be disturbed on review if supported by substantial evidence. *See State v. Black,* 100 Wn.2d 793, 802, 676 P.2d 963 (1984).

It is particularly important that these procedures be followed in death penalty competency claims. Federal habeas corpus review of a death penalty case is nearly inevitable. As the Supreme Court has observed, in a habeas corpus proceeding, "even a single federal judge may overturn the judgment of the highest court of a State insofar as it deals with the application of the United States Constitution or laws to the facts in question." *Sumner v. Mata, supra* at 543–44. As we have previously noted, however, the federal

habeas court will accord state court findings of fact a presumption of correctness, and those factual contentions may not be relitigated in federal court. *See* 28 U.S.C. § 2254(d); *Sumner v. Mata, supra* at 546–47. Thus, the state court finding of fact with regard to a petitioner's sanity for execution will not be subject to review, assuming that the state hearing comports with the requirements of 28 U.S.C. § 2254(d). The federal court will review, for constitutional error, the State's procedure by which the petitioner's sanity was determined. *See, e.g., Ford v. Wainwright, supra.*

## III

Perhaps the most awkward procedural question, and the one most in need of legislative response, is what to do if the defendant is found incompetent to be executed. Unless treatment is provided either in prison or in a state hospital, the problems which make a defendant unable to assist counsel (or otherwise incompetent to be executed) will likely never be corrected. The postconviction, postincompetency finding procedures need legislative clarification. Presently, the Department of Corrections has authority to transfer the prisoner to a state hospital for treatment, RCW 72.68.031, but is not required to initiate such transfers. Also, this statute does not give anyone other than the Department of Corrections authority to request that treatment be provided. If the Department does rely on the statutory procedure, the prisoner is entitled to a judicial, adversarial hearing regarding the need for treatment in a state hospital. *Harmon v. McNutt,* 91 Wn.2d 126, 131, 587 P.2d 537 (1978). This hearing could be held in conjunction with the hearing on the prisoner's motion to be declared incompetent to be executed.

If the Department does not become involved, it may be impossible to provide treatment over the defendant's objection. RCW 10.77 allows for commitment of defendants who claim either insanity at the time of the crime or incompetency at the time of trial, but as discussed above contains no provisions for committing those who develop mental problems following conviction. Also, a defendant

could not be committed under RCW 71.05 unless his mental problems made him gravely disabled or a danger to himself or others, RCW 71.05.150, and he would not necessarily meet these criteria simply because of his inability to assist counsel. (A defendant so detached from reality as to be unaware of an impending death sentence would probably be "gravely disabled", however.)

Regardless of whether treatment is provided, some procedure must exist for reviewing the defendant's case to determine whether he has regained his competency. In the absence of any statutory review procedures (which would exist if the defendant is committed under RCW 71.05), the order staying the execution should direct the parties to keep the court apprised of any changes in the defendant's condition. When these submissions indicate the defendant has regained his competency, a hearing could be held to determine whether the stay should be dissolved. As can be seen, the statutory procedures are sketchy at best. Appropriate legislative standards need to be developed.

CONCLUSION

(1) The oral finding by the trial court that Benjamin James Harris III is competent to be executed is affirmed. (2) The procedures set forth in this opinion for the postconviction determination of competency are to provide guidelines for subsequent cases. (3) The attention of the Legislature is directed to the matter of capital defendants who are found in postconviction proceedings to be incompetent to be executed.

CALLOW, C.J., and BRACHTENBACH, DORE, ANDERSEN, DURHAM, and SMITH, JJ., concur.

UTTER, J. (dissenting)—In *State v. Rice,* 110 Wn.2d 577, 621, 757 P.2d 889 (1988), this court held that the test for sanity at trial, sentencing or punishment is whether the defendant is "capable of properly appreciating his peril and of rationally assisting in his own defense". The majority confirms this standard and then ignores it, accepting the trial court's oral finding of competency which was based on

an incorrect definition of competency. Since I cannot agree with the majority's purported application of the standard of competency to the facts of this case, I dissent.

The United States Supreme Court has decreed that in capital proceedings, fact–finding procedures aspire to a heightened standard of reliability. *Ford v. Wainwright,* 477 U.S. 399, 411, 91 L. Ed. 2d 335, 106 S. Ct. 2595, 2602 (1986). "Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding." *Ford v. Wainwright, supra* at 411–12. The fact–finding procedure used by the trial court in the case at bar does not reach an acceptable level of reliability because the trial court failed to use the correct definition of competency to be executed and failed to consider relevant evidence.

The trial judge considered competency for execution to be separate from competency to assist counsel.[1] As a result, the trial judge refused to admit into evidence the report of the defense psychiatrist, Dr. Muscatel, because it was based on Harris' ability to assist counsel. Report of Proceedings, at 38. The trial judge should have admitted Dr. Muscatel's report because the ability to assist counsel is essential to a finding of competency. Instead, the trial judge concentrated on what Dr. Muscatel thought was the Kentucky standard for competency. Report of Proceedings, at 40. Dr. Muscatel thought that this standard was whether an individual is acutely psychotic or obviously agitated and confused, which indicates that the individual doesn't understand what is happening or why. Report of Proceedings, at 41. Neither party briefed nor argued to the trial judge what the appropriate standard in Washington would be.

Dr. Muscatel testified that Harris understood the nuts and bolts of the proceedings and was not having an acute

---

[1]"[A]s far as this court is concerned at this stage of the proceedings I think we are only concerned here with competency, as the witness said, for the purposes of execution, death warrant. I am not, in this court, concerned with his competency for the appeal process, or standing trial or any of these other matters." Report of Proceedings, at 35.

psychotic episode or hallucinating. From this, the trial judge found Harris competent to be executed under the Kentucky standard. But the Kentucky standard is not the Washington standard.

Under the Washington standard, Dr. Muscatel's testimony and written report give rise to grave doubts about Harris' competency to appreciate his peril or to rationally communicate with his counsel. Dr. Muscatel's testimony indicated that Harris does not appreciate his peril because he believes he will not be put to death.

> [T]he delusional system that he experiences, which causes him to believe that what he is experiencing that in fact that in essence although he knows that he's facing execution, he's unconcerned about it because he believes that he will be exonerated and set free before anything happens; therefore he's not concerned about being executed.

Report of Proceedings, at 44–45. Dr. Muscatel concluded, "[M]y major concern was . . . his judgment about what was happening to him and the ability to appreciate the reason that this might be happening to him". Report of Proceedings, at 47.

Concerning Harris' ability to assist counsel, Dr. Muscatel stated:

> [O]ne of the major features of my concerns about his competence with regards to assisting his attorney in a sense that he has—that Mr. Harris, when we talked, he would begin to answer the question and then move on in his own direction in a very tangential manner. And we would continue to talk and go off in the direction that I judged to be his delusional system. And, therefore, getting that information [concerning the process that resulted in his present situation] was very, very difficult. In his descriptions, his own attorney as well as the prosecutors and the courts and everybody else are deeply and completely imbedded [sic] in this plot of conspiracy against him.

Report of Proceedings, at 46. Dr. Muscatel's report concluded:

> I find that there is reason for substantial concern for this man's competence to assist his attorney in the current aspects of his appeals. He has no interest in discussing any aspect of his appeal process, except to have his attorney interrogate those people who he claims are central to the conspiracy against him and who he feels will exhonerate [sic] him in this matter.

> I am particularly concerned about his ability to provide a reasonable recounting of his experiences and conversations with his attorney at the time of his trial, and of the decisions that were made before and during the trial process. His recall of those times is so embedded in the delusions he holds at present . . . that it is nearly impossible to ascertain useful and coherent information from him on these matters.

Report of Dr. Muscatel, at 3.

Certainly, there is serious doubt about Harris' ability to rationally communicate with his attorney. All of Harris' discussions with counsel seem to concern this conspiracy. If this conspiracy is a delusion, this is not rational communication.

The majority claims that a defendant's ability to recall and recount events surrounding the crime is not crucial. Majority, at 429. However, it is necessary for a defendant to have this ability when appellate counsel was not trial counsel. The defendant is the only one in such a situation who can familiarize appellate counsel with the circumstances, some of which may not have come out at trial, so that counsel can provide effective assistance. According to Dr. Muscatel, Harris does not possess this important ability to recall the events of the crime.

Dr. Muscatel stated that he could not at that point say with certainty that Harris is incompetent. Counsel requested 3 weeks for Dr. Muscatel to further examine Harris and reach a more definite conclusion. Counsel requested that at that time, the court hold a competency hearing. Three weeks is not a major delay and counsel's request seems a reasonable one in light of the importance of the issue. The competence determination involves the highest possible stakes. It determines whether an individual lives or dies.

Federal law demands that we require a heightened standard of reliability from fact–finding procedures in capital cases. *Ford v. Wainwright, supra.* The trial court's oral finding, in an impromptu competency hearing for which neither party was sufficiently prepared, based on a standard for competency that does not apply in Washington, and

without consideration of relevant evidence discarded by the judge, is not an adequate finding of competency.

I would remand to the trial court for a competency hearing and give the trial court the opportunity to determine whether Harris meets the threshold burden of a showing of incompetency using the correct standard and considering all relevant evidence the parties have to offer.

This court should not be making a finding of competency based on the incomplete record before us. Accordingly, I dissent.

PEARSON, J. Pro Tem., concurs with UTTER, J.