[No. 57414-6. En Banc. October 8, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. WESTLEY ALLAN DODD, *Appellant*.

2

4

*Westley Allan Dodd,* pro se, *Darrell E. Lee,* and *Lee, Mitchelson, Yoseph, Gray & Langsdorf,* for appellant.

*Arthur D. Curtis, Prosecuting Attorney,* for respondent.

*Gilbert H. Levy* and *Judith M. Mandel,* amici curiae for appellant.

DORE, C.J. — Can a defendant in a capital case waive his general right of appellate review? This case is unique because the defendant, Westley Allan Dodd, wants to forgo appellate review and be executed as quickly as possible. We hold that the defendant in a capital case can waive his general right of review, but cannot waive statutory review of his death sentence. We affirm Dodd's death sentence.

## ISSUES

1. May a defendant in a capital case waive his right of general review?

2. Whether the jury properly imposed a sentence of death in Dodd's case.

## FACTS

On September 4, 1989, the bodies of 11-year-old Cole Neer and 10-year-old Billy Neer were discovered in David Douglas Park, Vancouver. Both boys sustained multiple stab wounds. Billy was fully clothed; Cole's pants were pulled down. Cole was dead when discovered. Billy died en route to the hospital.

On November 1, 1989, the nude body of a 4-year-old boy was discovered near Vancouver Lake. The body was that of Lee Iseli, of Portland, reported missing on October 29. Members of the Clark County Sheriff's Office, the Vancouver police and the Portland police formed a "task force" to investigate the case.

On November 13, 1989, the Liberty Theatre in Camas reported that an adult male tried to abduct James Kirk, a 6-year-old boy, from the theater. The man carried Kirk from the men's bathroom out of the theater, but Kirk was able to break free. Camas police arrested the abductor and brought him to the police department where he was identified as Westley Allan Dodd.

Police informed Dodd of his right to an attorney. They also made a phone and a list of attorneys available to him. Dodd did not call an attorney or request an attorney during the booking process.

Camas police discovered that Dodd had a history of sexual offenses involving young male victims, lived near David Douglas Park, and worked near Vancouver Lake. They also noted that Kirk was close in age to and resembled Lee Iseli. Camas police called officers investigating the Neer and Iseli cases.

Detectives Trimble and Jensen spoke with Dodd in the Camas police chief's office from 10:45 p.m. November 13 to 2:45 a.m. November 14. The first interview lasted from 10:45 p.m. to 1 a.m. The second interview lasted from 1 a.m. to 2:45 a.m.

Trimble advised Dodd of his *Miranda* rights at the beginning of the first interview. Dodd appeared alert and intelligent. He said he understood his rights, did not want an attorney, and was willing to speak with the police. The officers asked Dodd about the Neer and Iseli murders. Dodd denied any knowledge of the murders. Police asked Dodd if they could search his house and car. Dodd replied "I think I'd probably talk to an attorney before I let you do that." Detective Jensen asked Dodd if he minded speaking with the officers, if he felt better talking about "the whole thing."

Dodd replied he felt better talking to the officers and wanted to continue the interview. Dodd then admitted that he abducted Kirk and killed the Neer boys and Lee Iseli. Dodd told the officers they would find incriminating evidence in his apartment. Dodd agreed to do a second, taped interview.

At the beginning of the second interview, Officer Trimble read Dodd his *Miranda* rights. Dodd stated that he understood those rights, was willing to talk to the officers, and that he knew his statements were being recorded. Trimble and Dodd discussed the earlier reference to an attorney. Dodd affirmed that he never told the officers he did not want to speak with them and that he said talking to them would help. Exhibit 114, at 3. Dodd again summarized how he murdered the Neers and Lee Iseli, and kidnapped James Kirk. Exhibit 114, at 5-26.

Police sought and executed two warrants, from different judges, to search Dodd's house and car. Officers seized a briefcase from Dodd's apartment which contained Lee Iseli's underwear; a photo album of pictures Dodd took of Iseli before and after his death, with captions written by Dodd; and Dodd's "diary".

The first section of the diary, "1968 to 1989", recounts Dodd's sexual history.

"Incident 1" describes the circumstances of the Neer boys' deaths. From September 2 to September 4, 1989, Dodd spent hours, or entire days, surveying David Douglas Park to find "ideal" crime sites. He considered which times were best for "hunting", appraised possible victims, and considered how he could rape and murder children without being apprehended. Dodd also considered what weapons to use, obtained those weapons, and brought them to the park.

On September 4, he saw two boys who were the "proper age" playing on bikes in the park. He approached the Neer brothers, ordered the boys to come with him, and led them to a secluded area of the park. He told the boys to bring their bikes, because he did not want anyone to see the abandoned bikes and begin to search for the boys. In a

wooded area of the park, Dodd tied Billy's and Cole's wrists together, so that the boys faced him, and he raped Cole while Billy cried. Dodd then cut the boys loose, made them kneel down, and he tried to rape Cole again.

Dodd told the boys he wanted "one more thing." He took a knife from under his pant leg and stabbed Billy "in the gut." As Cole, who was still kneeling, started to rise, Dodd stabbed him in the side and chest. Despite his wounds, Billy tried to run away. Dodd pursued him and, as Billy repeated "I'm sorry, I'm sorry", Dodd fatally stabbed him. Dodd checked the area for incriminating evidence, made sure that Cole was dead, and then left the park. The next day Dodd put the knife in a manila envelope and threw the envelope in a dumpster.

"Incident 2 Rough Draft" and "Incident 2" describe how Dodd "hunted", raped, and killed Lee Iseli. Dodd described various means he might employ to murder victims, including "hang by neck"; strangle "with hands"; and strangle "by rope". He described how he would restrain victims, tying their "hands loosely over [their] head" and tying them down at the chest, knees, abdomen, and ankles. He considered the advantages of kidnapping a boy, "so I feel more comfortable and can take more time for various types of sex before killing the child." He expressed the desire to hang a nude 6-year-old victim and take pictures of the body. Dodd assessed possible crime sites, using maps and driving around the Portland area, and he bought a camera.

On October 29, around noon, Dodd went to a school playground he surveyed the preceding day. He saw a group of boys playing football and, away from the group, a younger boy playing alone. Dodd approached 4-year-old Lee Iseli and asked if he wanted to "have some fun and make some money." When the boy hesitated and seemed unsure, Dodd took his hand and led him from the playground to Dodd's car. Lee Iseli began crying in the car, but Dodd held Lee's hand and promised not to hurt him.

When they arrived at Dodd's apartment, at 1:30 p.m., Dodd noted the circumstances were "perfect": his neighbor

and landlord were out. Dodd told Lee to take off his clothes and, when the boy protested, began undressing him. Dodd tied Lee to a bed: the boy's hands over his head, restrained at the chest, knees, abdomen, and ankles; then took photographs of the nude boy. During the day and evening of October 29, and the morning of October 30, Dodd raped and strangled Iseli. The torturous details of the rapes and murder are not relevant to reaching a decision in this case. When Dodd returned from work the afternoon of October 30 he burned Iseli's clothing; put Iseli's corpse in a trash bag; and dumped "the garbage" near Vancouver Lake.

"Incident 3" concerned events that occurred before the Kirk abduction.

The prosecutor, in separate informations, charged Dodd with one count of aggravated murder in the first degree of Lee Iseli; one count of aggravated murder in the first degree of Cole Neer; one count of aggravated murder in the first degree of William Neer; one count of attempted murder in the first degree of James Kirk; and one count of kidnapping in the first degree of James Kirk. Dodd pleaded not guilty to all charges.

In May 1990, Dodd moved to suppress his confession and the evidence seized in his home pursuant to warrants 174 and 175. The court concluded that the confession was voluntary and the evidence properly seized from Dodd's home. It reasoned that even if the confession evidence in warrant 174 was discounted, other evidence, particularly Dodd's move to Vancouver at the time of the events; the proximity of his home and workplace to crime sites; and a neighbor's statement that he saw a boy who resembled Lee Iseli in Dodd's apartment at the time of the Iseli murder, wearing only Dodd's undershirt; provided substantial evidence of probable cause for search warrants to examine Dodd's apartment and car.

In June 1990, after the adverse evidentiary rulings, Dodd changed his plea to guilty. Dr. Maletzky assessed Dodd's competence to plead guilty. The doctor determined that Dodd

was "competent to aid and assist in his own defense and is competent to enter a plea." The court also closely questioned Dodd and determined that he had: discussed the decision with his attorneys; reviewed with them the plea forms; and he understood the consequences of a guilty plea. The court also reviewed the terms of the plea with Dodd. Dodd's counsel believed Dodd competent to enter a guilty plea. Dodd pleaded guilty to the aggravated first degree murders of Lee Iseli and Cole and William Neer, and the attempted first degree murder of James Kirk.

At the penalty proceedings, Dodd moved to exclude any reference to his "diary". The court excluded the sections entitled "1968 to July 1989" and "Incident #3". It reviewed remaining sections of the diary, line by line. The court excluded any evidence of Dodd's sexual activity with Lee Iseli's corpse. It entered thorough oral and written findings concerning the other evidence admitted and excluded.

Before and during the penalty phase, Dodd's attorneys gathered mitigating evidence. They reviewed the possibility of calling mitigating witnesses with investigators, including Ms. McMahill. The attorneys and investigators discussed with Dodd the possibility of calling witnesses who would offer mitigating evidence.

After consulting with counsel, Dodd chose not to present mitigating evidence and so instructed his attorneys. The court discussed this decision with Dodd at the close of the State's case and told him to think about it overnight before he determined not to call any witnesses. The next day, the court affirmed that Dodd understood he could introduce mitigating evidence, that investigators had gathered potential mitigating evidence, and that it was Dodd's decision, after consulting with his attorneys, not to present such evidence. At the June 1991 hearings, Dodd testified that he was satisfied with the efforts of the investigators and attorneys. He stated that his attorneys did not present mitigating evidence because he told them not to and because cross examination might reveal other damaging information.

The jury sentenced Dodd to death on July 14, 1990. The court imposed sentences of death for the aggravated murders of Billy and Cole Neer and Lee Iseli.[1]

At sentencing, Dodd objected to "automatic review" of his case by this court. He stated that he would not file an appeal and asked that the trial court accept his waiver of any appeal except the sentence review, but the court declined. The trial court appointed Ms. Mandel and Mr. Levy to handle Dodd's appeal.

Dodd informed the court on January 5, 1991, that he understood the difference between the sentence review of RCW 10.95 and a "general" appeal. He expressed his "continued desire that there be no appeal beyond the mandatory sentence review" and asked this court "to instruct [amici] that they are not to raise or address any issues other than those mandated by statute for purposes of the mandatory sentence review . . .." On February 11, 1991, Dodd again contacted this court. He stated that the trial court:

> [W]ent out of its way to ensure I had a fair trial. The jury went out of its way in attempting to find a mitigating factor to merit leniency, but they found nothing and made the only possible decision according to the statutes of the state of Washington. There is no reason to waste . . . time and money on what I firmly believe would be useless appeals. I again ask that I be allowed to waive all *waivable* rights to appeal and that the mandatory proportionality review be heard in a timely manner.

We redesignated Dodd's attorneys as amici curiae, appointed new counsel to represent Dodd, ordered a fact-finding hearing to determine whether Dodd's decision to waive his general right of appeal was made knowingly and voluntarily and resolve any question regarding his competency, and ordered that the waiver issue be presented at the same time as the argument on appeal.

At the fact-finding hearing, Dr. Larsen opined that Dodd was intellectually intact and not suffering from any psychosis. The doctor stated that Dodd was oriented; did not exhibit

---

[1] In a separate proceeding, the court sentenced Dodd to a determinate sentence of 50 years for the attempted murder of James Kirk.

a thought disorder; and did not suffer hallucinations, delusions, "psychotic elements", significant personality disorder, or any physical disease. Dr. Larsen diagnosed Dodd as suffering from "severe homosexual pedophilia . . . [displaying] no evidence of mental disease or defect." Exhibit 111(d). Dr. Larsen concluded that Dodd understands the charges against him, the consequences of those charges, and the consequences if he waives his right of appeal. Dr. Larsen opined that one rationally can choose to die and that Dodd rationally has made that choice.

Dr. Parvaresh agreed with Dr. Larsen. He also testified that Dodd possessed above average intelligence, intact memory, insight, and the ability to make sound judgments concerning his welfare. Dodd did not exhibit any evidence of psychosis, organic psychopathology, or other impairment that prevents him from understanding the nature of these legal proceedings or the consequences if he waives the proceedings. Dr. Parvaresh stated that Dodd has a diagnosable psychiatric disorder: Pedophilia, sadism with mixed personality. That disorder, however, does not impair his ability to understand the consequences if he waives his right to appeal. Dr. Parvaresh concluded that there is no reason to question Dodd's competence, Dodd understands and appreciates the peril he faces, and he has the capacity to voluntarily and intelligently waive his right to appeal.

Ms. Araiza, a social worker, met with Dodd several times and conducted a mental status exam. She concluded that Dodd is coherent, oriented, intelligent, and is free of psychosis, delusions, or hallucination. Ms. Araiza testified that Dodd's abstract thinking and insight is good, his memory is intact, he is logical, and he understands the connection between behavior and its consequences. Ms. Araiza concluded that Dodd was competent, understood the ultimate sentence in this case, and was capable of assisting in his defense.

Dodd testified that the sentencing proceeding was fair and that any alleged errors were harmless, and that even if on retrial he might escape the death penalty, he did not want to appeal issues from the penalty phase. Dodd under-

stood that he could die if he waived his right to appeal, said that he gave the decision to waive a lot of thought, and that he accepted the "reality" of death. Dodd stated he would rather die than live his life in a cell, that this had been his position since the sentencing, that he would not change his mind in the future, and that he was competent to make that decision. Dodd testified that even if the death penalty were declared unconstitutional and he could be released, he wanted to waive his right to appeal.

Mr. Lee, Dodd's attorney on appeal, testified that Dodd is intelligent and expresses himself clearly. Lee reported that Dodd understands the charges against him, is able to assist counsel in his defense, and understands that he may die if he waives his right to appeal. Lee opined that Dodd, after weighing death and the possibility of life imprisonment without parole, rationally preferred death.

At the fact-finding hearing, Dodd moved to admit the evidence that the trial court excluded during the sentencing proceeding. The State did not object and the court admitted the evidence. All of the evidence the State offered at trial, even that which the court originally excluded, is before us on review.

The court found that Dodd suffers "no mental impairment which . . . affect[s] [his] decision to waive his rights of appeal." Verbatim Report of Proceedings (June 12, 1991), at 67. It opined that there is "no evidence that [Dodd] has not had an adequate understanding of his legal rights"; Dodd "fully understands the peril . . . he faces from the verdict of the jury"; he clearly understands the effect that waiving his appeal will have, *viz*, that he will be put to death; Dodd is competent to make decisions and his desire to be put to death is "based on a thoughtful process"; and that Dodd can "rationally assist his attorney". Based on his observation of Dodd during the proceedings, the court found that Dodd interacted with his attorney, understood the alternatives discussed with him, and possessed an in-depth understanding of the issues considered at the hearing. The judge stated that at previous hearings, when he spoke with Dodd, Dodd possessed "a clear

understanding of the issues . . . and . . . had a clear and rational decision-making process with respect to those issues."

The court stated that at all times Dodd has acted rationally and made independent decisions. It found that Dodd's decision to waive his right to appeal was "a considered decision", which he "unwaveringly" maintained, and that it was not the product of any psychological impairments. The court stated that Dodd "not only waived his right to appeal . . . but also . . . waived any other claim of error that anyone" could present. Because Dodd did not authorize anyone to file a notice of appeal and asked that the notice in this case be withdrawn, the court found there is no valid notice of appeal filed.

## ANALYSIS

This case is unique and presents a question of first impression in the State of Washington. Dodd wants to waive appellate review except that required by RCW 10.95.100, which governs review of death sentences. Amici allege that allowing defendant to limit the scope of review to the inquiry set forth in RCW 10.95.130 violates the Eighth Amendment's prohibition against "cruel and unusual punishments". The State contends that the statutory language of RCW 10.95 and case law interpreting the Eighth Amendment allow a capital defendant to waive review of all claims but those mandated by statute.[2]

---

[2]The Eighth Amendment, which prohibits "cruel and unusual punishments", applies to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962). Infliction of the death penalty especially invokes the concerns of the Eighth Amendment because the penalty is irrevocable. *Furman v. Georgia*, 408 U.S. 238, 306, 33 L. Ed. 2d 346, 388, 92 S. Ct. 2726, 2760 (1972). The Supreme Court, therefore, imposes procedural and substantive restrictions on legislatures and sentencing authorities, to ensure that "capital punishment is not imposed without . . . serious and calm reflection . . .." *Thompson v. Oklahoma*, 487 U.S. 815, 856, 101 L. Ed. 2d 702, 733, 108 S. Ct. 2687, 2710 (1988). The sentencing scheme must not allow the death penalty to be wantonly or freakishly imposed, it must direct and limit jury discretion, to minimize the risk of arbitrary or capricious action, and it must allow particularized consideration of relevant aspects of the character and record of each defendant, and the circumstances of the offense, before imposition of

RCW 10.95.100 provides that:

> **Mandatory review of death sentence by supreme court** . . . Whenever a defendant is sentenced to death, upon entry of the judgment and sentence in the trial court the sentence shall be reviewed on the record by the supreme court of Washington.

The act further states:

> **Questions posed for determination by supreme court in death sentence review — Review in addition to appeal** . . . (1) The sentence review required by RCW 10.95.100 shall be in addition to any appeal. The sentence review and an appeal shall be consolidated for consideration. . . .
>
> (2) With regard to the sentence review required by this act, the supreme court of Washington shall determine:
>
> (a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and
>
> (b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. . . . "[S]imilar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120; and
>
> (c) Whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130. And RCW 10.95.150 provides that "[A]ppellate review, if any, and sentence review" shall be decided within a year after the clerk receives the record of a capital case.

 The text of RCW 10.95.100 and .130 states that this court "shall" review a sentence of death. The word "shall" in a statute is imperative and creates a duty. *State v. Smith*, 117 Wn.2d 263, 271, 814 P.2d 652 (1991). Use of the term "shall" in RCW 10.95.100 and .130 also establishes that this court must review a sentence of death, regardless of a defendant's wishes. Moreover, this court has acknowledged that RCW

---

the sentence. *Gregg v. Georgia*, 428 U.S. 153, 188-89, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932, *reh'g denied*, 429 U.S. 875, 50 L. Ed. 2d 158, 97 S. Ct. 197, 198 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2991 (1976).

10.95 "requires" it to review a sentence of death. *In re Rupe*, 115 Wn.2d 379, 388, 798 P.2d 780 (1990).

Although RCW 10.95 requires review of a death sentence, the act also suggests that a defendant may waive general review. First, the Legislature distinguished between "sentence review" and general "appellate review". Second, it requires sentence review, but indicates general review is not required, as evidenced by the phrase "if any", referring to general appellate review. The directive that sentence review is "in addition to any [general] appeal" also suggests general review must be available, but may be waived.[3]

We believe that the review procedure set forth in RCW 10.95, which requires appellate review of a death sentence but does not require a general appeal, meets constitutional standards. Mandatory sentence review minimizes the risk of random or arbitrary sentencing and the review is "prompt and automatic". *Pulley v. Harris*, 465 U.S. 37, 48-49, 79 L. Ed. 2d 29, 39, 104 S. Ct. 871, 878-79 (1984); *see Gregg v. Georgia*, 428 U.S. 153, 196-207, 49 L. Ed. 2d 859, 887-93, 96 S. Ct. 2909, *reh'g denied*, 429 U.S. 875, 50 L. Ed. 2d 158, 97 S. Ct. 197 (1976).

State and federal courts that address the issue agree that a defendant may, consistent with the Eighth Amendment, waive his right of general appeal.

### Gilmore-Whitmore

The United States Supreme Court, in *Gilmore v. Utah*[4] and *Whitmore v. Arkansas*,[5] effectively holds that a defendant may knowingly and voluntarily waive appellate review. We believe *Gilmore* and *Whitmore* are controlling in this case. A jury convicted Gilmore and sentenced him to death.

---

[3]*Webster's Third New International Dictionary* 24 (1971) defines "in addition to" as "over and above". The *Random House Dictionary of the English Language* 23 (2d ed. 1987) defines "in addition to" as "as well as, besides".

[4]429 U.S. 1012, 50 L. Ed. 2d 632, 97 S. Ct. 436, *reh'g denied*, 429 U.S. 1030, 50 L. Ed. 2d 636, 97 S. Ct. 655 (1976).

[5]495 U.S. 149, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990).

Gilmore did not appeal or seek a stay of execution, but his mother, as "next friend", applied for a stay of execution. Gilmore responded that his mother did not have standing to act on his behalf.

Justices Burger and Powell stated that Mrs. Gilmore did not have standing as "next friend" unless:

> it were demonstrated that . . . Gilmore is unable to seek relief in his own behalf. . . . The only possible exception . . . would be if the record suggested . . . that he was incompetent to waive his right of appeal under state law and was at the present time incompetent . . ..

(Citation omitted.) *Gilmore*, 429 U.S. at 1014, 50 L. Ed. 2d at 633. The Justices agreed that Gilmore "knowingly and intelligently, with full knowledge of his right to seek an appeal . . . has waived that right." *Gilmore*, 429 U.S. at 1014-15, 50 L. Ed. 2d at 633-34. They also agreed that:

> the State's determinations of his competence to waive his rights knowingly and intelligently were firmly grounded. . . .
> When the record establishing a knowing and intelligent waiver of . . . Gilmore's right to seek appellate review is combined with the . . . written response [Gilmore] submitted to this Court, it is plain that the Court is without jurisdiction to entertain the "next friend" application filed by Bessie Gilmore. . . ."

(Footnote omitted.) *Gilmore*, 429 U.S. at 1015-16, 50 L. Ed. 2d at 634. Justices Burger and Powell found that "Gilmore, duly found . . . competent by the Utah courts, has had available meaningful access to this Court and has declined expressly to assert any claim here other than his explicit repudiation of [his mother's] efforts to speak for him . . .." *Gilmore*, 429 U.S. at 1017, 50 L. Ed. 2d at 635. They concluded that because Gilmore knowingly and intelligently waived his right to review, the Court could not consider Mrs. Gilmore's "next friend" application. *Gilmore.* Justices Stevens and Rehnquist concurred, stating:

> [T]he record not only supports the conclusion that Gilmore was competent to waive his right to appeal, but also makes it clear that his access to the courts is entirely unimpeded and therefore a third party has no standing to litigate an Eighth Amendment claim . . . on his behalf.

*Gilmore*, at 1017.

In *Whitmore*, Ronald Simmons was sentenced to death for killing two people and wounding three others. Simmons waived any right of appeal. The trial court determined that Simmons was competent and accepted his waiver. The Arkansas Supreme Court denied Franz the right to prosecute an appeal on Simmons's behalf, as "next friend".[6] The District Court confirmed that Franz did not have standing to prosecute an action as Simmons's "next friend". *Whitmore*, 495 U.S. at 152-53, 109 L. Ed. 2d at 143, 110 S. Ct. at 1721.

In a second proceeding, the jury convicted and sentenced Simmons to death for killing 14 people. Simmons waived his right to appeal. The court found him competent and accepted the waiver. The State Supreme Court affirmed the trial court's decision. Whitmore, another death row inmate, moved to intervene in the proceedings. *Whitmore*, 495 U.S. at 153, 109 L. Ed. 2d at 143-44, 110 S. Ct. at 1722.

The United States Supreme Court concluded that Whitmore did not have standing to prosecute an action individually. *Whitmore*, 495 U.S. at 161, 109 L. Ed. 2d at 149, 110 S. Ct. at 1726. The Court also held that, absent evidence that Simmons suffered a condition which prevented him from making an intelligent decision, Whitmore could not intervene as Simmons's "next friend". It reasoned that:

> [O]ne necessary condition for "next friend" standing . . . is a showing by the proposed "next friend" that the real party . . . is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability.
>
> That prerequisite . . . is not satisfied where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded. . . . The Supreme Court of Arkansas . . . affirmed the . . . finding that Simmons had "the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence." . . . [W]e find no reason to disturb the judgment . . ..

(Citations omitted.) *Whitmore*, 495 U.S. at 165, 109 L. Ed. 2d at 151-52, 110 S. Ct. at 1728-29.

---

[6]*See Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988).

The Supreme Court in *Gregg* approved a bifurcated proceeding in capital cases, in which sentencing is considered after the determination of guilt, and aggravating and mitigating "standards" guided the sentencing body's discretion. The Court has emphasized that appellate review is essential, as a check against random or arbitrary imposition of the death penalty.[7] The Court, however, has not directly addressed whether a defendant may waive or limit the scope of review. The analyses in *Gilmore* and *Whitmore* indicate that the defendant in a capital case may waive his right of general appeal, provided that the court establishes that the defendant is competent and his decision knowing and voluntary. These cases support our conclusion that Dodd can waive general review, if his waiver is knowing and voluntary. The weight of authority from other state and federal courts further supports the conclusion that Dodd can waive general review.

Other Federal and State Courts

The Louisiana Supreme Court reviews "every sentence of death to determine if it is excessive," applying the same standard that RCW 10.95.130 employs. La. Code Crim. Proc. Ann. art. 905.9; La. Sup. Ct. R. 28 (905.9.1). The court in *Martin v. Blackburn*, 521 F. Supp. 685, 713 (E.D. La. 1981) stated that:

> There is . . . no general federal constitutional right to state appellate review of state convictions and capital sentences. . . . Therefore, there is no general federal constitutional requirement that the State . . . afford a [capital] defendant . . . any appellate review of his conviction and sentence at all.

The court's reasoning suggests that a capital defendant may waive general review.

Arkansas's sentencing scheme makes review available, but a defendant may decline review.[8] *Franz v. State,* 296

---

[7]*See Pulley v. Harris*, 465 U.S. at 44-45, 48-50, 53-54, 79 L. Ed. 2d at 37, 43, 104 S. Ct. at 877, 881; *Jurek v. Texas*, 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958 (1976); *Proffitt v. Florida*, 428 U.S. 242, 250, 251, 253, 258-60, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976).

[8]The United States District Court for the Eastern District of Arkansas severely criticized the State's statutory scheme in *Franz v. Lockhart*, 700 F.

Ark. 181, 188-89, 754 S.W.2d 839, 843 (1988). If he does so, the trial court determines whether the defendant is competent to waive his right of review, the State Supreme Court reviews that competency determination, and if the Supreme Court determines that a defendant is competent, then proceedings terminate. *Franz*, at 189-90; *Simmons v. Arkansas*, 298 Ark. 193, 194, 766 S.W.2d 422, 423 (1989).

Nevada and Indiana require review of a death sentence, pursuant to state statutes.[9] In both states, a defendant may waive general review if the trial court finds that the defendant is competent.[10] The Supreme Court of Nevada reviews the competency determination when it reviews the sentence. *Kirksey v. State*, 107 Nev. 499, 502, 814 P.2d 1008, 1010 (1991). The Indiana Supreme Court conducts a hearing, to determine if the defendant is competent to waive his general appeal. *Judy v. State*, 275 Ind. 145, 149, 155, 157, 416 N.E.2d 95 (1981); *Vandiver v. State*, 480 N.E.2d 910, 912 (Ind. 1985).

The weight of authority from federal and state courts supports our conclusion that a capital defendant may waive general review and limit his appeal to statutory review of his sentence. We recognize that several courts have held to the contrary.[11] Those cases, however, are distinguishable

---

Supp. 1005, 1023-24 (E.D. Ark. 1988) because the scheme allows a defendant to forgo any review at all, of conviction or sentence. The court's discussion of the scope of review was dicta, however, since "under precedent binding on" the court, Franz did not have standing to raise the waiver issue. *Franz*, at 1024.

[9]Nev. Rev. Stat. § 177.055 (1992); Ind. Code Ann. § 35-50-2-9(h) (Burns 1972).

[10]In Nevada, a waiver must be "intelligently made and with full comprehension of its ramifications." *Cole v. State*, 101 Nev. 585, 588, 707 P.2d 545, 547 (1985); *see Flanagan v. State*, 105 Nev. 135, 139, 771 P.2d 588, 591 (1989). In Indiana the waiver must be "knowing, voluntary, and intelligent". *Judy v. State*, 275 Ind. 145, 157, 416 N.E.2d 95, 101 (1981); *see Vandiver v. State*, 480 N.E.2d 910, 912 (Ind. 1985).

[11]*Massie v. Sumner*, 624 F.2d 72, 74 (9th Cir. 1980); *State v. Brewer*, 170 Ariz. 486, 826 P.2d 783 (1992); *People v. Stanworth*, 71 Cal. 2d 820, 833, 457 P.2d 889, 898, 80 Cal. Rptr. 49, 58 (1969); *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174, 180 (1978); *Goode v. State*, 365 So. 2d 381, 384 (Fla. 1978).

from Dodd's. The Pennsylvania statute examined in *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978) was unconstitutional on its face; Washington's death penalty statute is constitutional. *State v. Rupe*, 101 Wn.2d 664, 697-98, 683 P.2d 571 (1984). The Florida statute discussed in *Goode v. State*, 365 So. 2d 381 (Fla. 1978), the California statute at issue in *Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980) and *People v. Stanworth*, 71 Cal. 2d 820, 457 P.2d 889, 80 Cal. Rptr. 49 (1969), and the Arizona statute in *State v. Brewer*, 170 Ariz. 486, 826 P.2d 783 (1992) all contain broader language than that chosen by our Legislature. They require review of the "judgment" or the "judgment of conviction and sentence". Our Legislature mandates review only of "the sentence".

In summary, a defendant may, consistent with RCW 10.95, waive his right of general review but may not waive statutory sentence review. A waiver must be knowing, voluntary, and intelligent. *Whitmore v. Arkansas, supra*. The trial court must hold a hearing and determine whether a defendant's waiver of general review is valid. This court will review the trial court's determination when it reviews the sentence.

The amici contend that even if the federal constitution allows a capital defendant to waive general appellate review, article 1, section 14 of our state constitution precludes such a waiver. The six nonexclusive factors set forth in *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986) determine whether the state constitution offers greater protection to a defendant than the federal constitution:

1. The textual language of the state constitution;
2. Significant differences in the texts of parallel provisions of the federal and state constitutions;
3. State constitutional and common law history;
4. Preexisting bodies of state law, including statutory law;
5. Differences in structure between the federal and the state constitutions; and
6. Matters of particular state interest or local concern.

Applying these criteria, we conclude that Const. art. 1, § 14 does not extend greater protection than the Eighth Amendment and does not bar a capital defendant from waiving general review.

Article 1, section 14 prohibits "cruel punishment". The Eighth Amendment prohibits "cruel and unusual punishments". Article 1, section 14, on its face, may offer greater protection than the Eighth Amendment, because it prohibits conduct that is merely cruel; it does not require that the conduct be both cruel and unusual.

The drafters of the constitution did not adopt the ordinary phrase "cruel and unusual" because they thought the term "cruel" was "sufficient". *State v. Fain*, 94 Wn.2d 387, 393, 617 P.2d 720 (1980); *Journal of the Washington State Constitutional Convention, 1889*, at 501-02 (B. Rosenow ed. 1962). The constitutional record does not indicate whether the framers believed the term "cruel" was synonymous with or more expansive than the term "cruel and unusual". Thus, it is not clear that the parallel provisions are significantly different.

The constitutional history of Const. art. 1, § 14 does not establish whether the drafters intended article 1 to be interpreted more broadly than its federal counterpart. *See Journal, supra*. This court twice has interpreted article 1, section 14, more broadly than the Eighth Amendment. In *State v. Fain, supra*, we determined that sentencing a defendant to life imprisonment, without parole, for thefts that totaled less than $500 was unconstitutionally disproportionate. *Fain*, at 389, 402. We reached the issue, even though the defendant would not have a claim under the Eighth Amendment. *Fain*, at 392-93. In *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984), this court concluded that portions of RCW 10.95 violated the Eighth Amendment. We also stated that even if the provisions did not violate the federal constitution, the Supreme Court's interpretation of the Eighth Amendment did not constrain our interpretation of the cruel punishment clause of the state constitution. *Bartholomew*, at 639.

Former RCW 10.94.030, the precedent statute to RCW 10.95.100, required this court to review a death sentence but contemplated that a defendant could limit his appeal to that required by the statute. Former RCW 10.94.030(3). It stated that the sentence review was "in addition to direct appeal, *if taken*". The Legislature did not require automatic review of a death sentence or conviction before 1977.

The federal constitution is a grant of limited power, while the state constitution imposes limitations on the otherwise plenary power of the State to do anything not expressly forbidden by the state constitution. *Gunwall*, at 66. We previously have held that this distinction supports construing constitutional amendments more broadly, to protect a defendant's personal rights. *Gunwall*, at 66-67. This rationale, however, is not persuasive in a situation such as Dodd's, where the defendant emphatically does not wish to exercise his personal rights, and the amici justify enforcement of those rights based on public interest *overriding* defendant's personal interest.

Preventing arbitrary or "cruel" capital punishment is not a local concern. Further, as noted above, our state did not mandate review of death sentences until 1977.

The *Gunwall* factors do not demand that we interpret Const. art. 1, § 14 more broadly than the Eighth Amendment. Const. art. 1, § 14 does not preclude the defendant in a capital case from limiting the scope of review to that required by state statute.

■■ Having concluded that Dodd may waive a portion of his right of review, we must determine whether he is competent to enter such a waiver. We have not formulated the standard of competency applicable when reviewing a capital defendant's waiver of his right of general appeal. The Supreme Court, in *Whitmore*, approved Arkansas's test: whether the defendant had "the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence." *Whitmore*, 495 U.S. at 165, 109 L. Ed. 2d at 151-52, 110 S.

Ct. at 1728. The Arkansas standard focuses attention on the critical issue in a capital case: whether the defendant has the capacity to choose between life and death and it is consistent with the competency tests other federal and other state courts approve or apply when a defendant waives appeal.[12] The *Whitmore* standard also is consistent with the standard of competence we require for the State to execute a capital defendant. *State v. Harris*, 114 Wn.2d 419, 427-28, 789 P.2d 60 (1990).[13] In Dodd's case and in the future, we will apply the competency standard that the Supreme Court approved in *Whitmore* when reviewing a capital defendant's waiver of his general right of review.

The testimony of Drs. Larsen and Parvaresh and of Ms. Araiza support the trial court's conclusion that Dodd understood the choice between life and death, and knowingly and voluntarily waived his right of general appeal. The trial court's observations of Dodd during the competency hearing and prior proceedings also support the conclusion that Dodd was competent to waive general review. Further, the material defendant submitted to this court confirms that Dodd appreciated the consequences of his waiver, and knowingly and voluntarily waived all rights to a general appeal.[14] The record supports the trial court's determination that Dodd was competent to waive general review and we accept his waiver.

---

[12]The federal courts demand that a defendant have the "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation". *Franz v. Lockhart*, *supra* at 1011. Nevada requires that a waiver be "intelligently made and with full comprehension of its ramifications." *Flanagan*, at 139.

[13]In *Harris* we stated: "[A] defendant is competent to be executed if he 'is capable of properly appreciating his peril and of rationally assisting in his own defense . . ..'" *Harris*, at 427-28. This standard applies "equally in the context of a person's insanity at the time of punishment as it does at the time of trial." *Harris*, at 428.

[14]Finally, the amici concede that Dodd is competent:

"Justice Dore: We had a competency hearing down in Vancouver, conducted by Judge Harris and he held that [Dodd] was very competent. And I notice that

## MANDATORY SENTENCE REVIEW

Because Dodd validly waived his right of general review, we turn next to the sentence review that RCW 10.95 requires. The jury concluded that "there are not sufficient mitigating circumstances to merit leniency" in this case. RCW 10.95-.060(4). Washington's death penalty statute demands that we review that determination and answer three questions:

1. Whether sufficient evidence justifies the finding that "there are not sufficient mitigating circumstances to merit leniency";

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

3. Whether the sentence of death was brought about through passion or prejudice. RCW 10.95.130(2).

■ Assessing the sufficiency of the evidence, this court asks whether:

> after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt.

*State v. Rice*, 110 Wn.2d 577, 623, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989) (quoting *State v. Rupe*, 108 Wn.2d 734, 765, 743 P.2d 210 (1987)). We do not weigh the aggravating factors against the mitigating factors the way the jury did; rather we consider the circumstances of the crime and any mitigating circumstances and determine whether a rational jury could have concluded that mitigating circumstances do not outweigh the circumstances of the

---

in your argument today you said he was a very intelligent person. Are you conceding that he's competent . . . in this case?

"Levy: Uh, yes.

"Dore: You're not raising that argument?

"Levy: Uh, no." Tape of oral argument before Supreme Court (Jan. 14, 1992). We also note that Mr. Lee, who represented Dodd, was present when amici made this statement and he did not object.

crime. *Rice*, at 624-25. The record in this case establishes that Dodd intentionally and with premeditation killed three children. In each case, the desire to conceal his identity was an essential motive for the murder. The Iseli murder was particularly brutal.

Dodd chose not to present mitigating evidence at the sentencing hearing. The amici point to evidence that they believe is mitigating: Dodd participated in band during the 1970's and was well liked by his band instructors; he was honest, trustworthy, and reliable when assisting in band practice; his parents argued frequently and his father tried to commit suicide in 1976; he took his parents' divorce in 1977 hard; he was physically inept and often laughed at at school; and he once cried because he didn't like molesting children. The doctors' reports contradict any suggestion that Dodd suffered a mental disease, other than pedophilia, which would merit leniency. The other mitigating factors listed in RCW 10.95.070 do not apply to Dodd's case.

The mere presence of mitigating factors does not require that the jury grant leniency, if the jurors are convinced that the circumstances of the crime outweigh the mitigating factors. *Rice*, 110 Wn.2d at 624. The jury correctly concluded here that the aggravating circumstances of this crime overwhelm any mitigating factors. Dodd committed three murders to conceal his identity; he committed murder during the course of or in furtherance of, or in immediate flight from, the rapes of Cole Neer and Lee Iseli; he committed murder during the course of or in furtherance of the kidnapping of Lee Iseli; and, in the Neer case, there was more than one victim. Based upon the record before us, we can only conclude that sufficient evidence supported the jury's finding that "there are not sufficient mitigating circumstances to merit leniency" in this case. Even if the jury had considered the alleged mitigating evidence, it is obvious it would not have changed its verdict.

██ Next, considering the crime and the defendant, we must determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. "Similar cases" are cases:

> reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]

RCW 10.95.130(2)(b). A case is not disproportionate if:

> in similar cases throughout the state the death penalty has been imposed *generally* and not "wantonly and freakishly. . .".

*State v. Lord*, 117 Wn.2d 829, 909, 822 P.2d 177 (1991) (quoting *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987)). The concept of "proportionality" does not require precise uniformity between cases. *State v. Lord, supra* at 910. Precise uniformity is not possible because "the brutal and extreme [crimes] with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph." *Lord*, at 910. Instead, the court looks for "overlapping similarities" and common resemblances between cases. *Lord*, at 911.

Dodd was convicted of killing three children, between the ages of 4 and 11. In six other cases a defendant killed three or more victims. *State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *State v. Rice*, 110 Wn.2d 577, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989); *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986); Report of the Trial Judge, State v. Ng, King Cy. cause 83-1-00504-0; Report of the Trial Judge, State v. Runion, King Cy. cause 89-1-03429-4; Report of the Trial Judge, State v. Macas, King Cy. cause 89-1-01251-7. In the *Mak*, Ng, Runion, and Macas cases, however, there were fewer aggravating factors and, in three of those cases, there were significant or "powerful" mitigating

factors that are not present here. Four of the "similar cases", thus, do not closely resemble Dodd's.

Dodd's case most closely resembles the *Campbell* and *Rice* cases, in which the death penalty was imposed. Campbell murdered three victims, one of them a child. Rice murdered a family of four, including two children. Neither Campbell nor Rice, however, preyed exclusively upon children, as did Dodd.

Both the *Campbell* and *Rice* cases included multiple victims and concealment of identity as aggravating factors. Campbell and Rice, however, murdered in the course of a single crime, robbery. Dodd's murders, conversely, were committed in the course of the rape of one victim and the rape and kidnapping of another. Comparing Dodd's offense to the offenses in similar cases, his sentence of death is not excessive or disproportionate.

We must also consider Dodd's personal characteristics. Dodd's record of prior convictions is not as significant as the defendants' records in *Rice* or *Campbell*. Lack of criminal history, alone, however, does not render a sentence disproportionate. The defendant in *State v. Rupe*, 108 Wn.2d 734, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988) had no criminal history but was sentenced to death, and this court affirmed his sentence. *Rupe*, at 770. Further, Dodd has an "ingrained" pattern of predatory, sexually deviant behavior that counselors believe is untreatable and renders him dangerous. And, despite counsel's suggestion in closing argument, there is no credible evidence of mental disease, other than pedophilia with personality disorder. Finally, Dodd killed three children in an extraordinarily vicious and cold-blooded manner, and the evidence indicates that Billy Neer and Lee Iseli suffered for a significant length of time before their deaths. Dodd's treatment of Lee Iseli constitutes mental and physical torture. Dodd's sentence is not excessive or disproportionate.

This court, lastly, must determine whether passion or prejudice brought about Dodd's sentence. We find no evi-

dence that passion or prejudice brought about the sentence. The photographs and diary excerpts that Dodd moved to admit at the competency proceeding, which might have engendered passion or prejudice, were correctly excluded by the trial court from the sentencing proceeding and, thus, did not influence the jury's decision.[15] Dodd's sentence was not the result of passion or prejudice.

Since the date of his conviction on July 14, 1990, Dodd has consistently expressed his desire to waive general review, complete the statutory review, and be executed. In letters to this court, proceedings before the trial court, and in television interviews from his cell, seen by thousands of viewers, Dodd has affirmed his guilt and reiterated his desire that this court conclude its review so the State may carry out his sentence. He stated, in his brief to this court:

> I waive my right to appeal. I plead guilty, again, to the rapes and murders. If this case is sent back to a trial court I will plead guilty again and physically and vocally demand my conviction and death sentence.

### SUMMARY

We hold that a defendant may waive general review, but may not waive review of his sentence, under RCW 10.95-.100. Based on our review of the record and after comparing Dodd's case to "similar cases" we conclude that sufficient evidence supported Dodd's sentence, the sentence was not excessive or disproportionate, and it was not the result of passion or prejudice.

### CONCLUSION

1. This court must review any sentence of death, pursuant to RCW 10.95 and the state and federal constitutions.

2. The defendant in a capital case may waive his general right of review, provided that he is competent to make such a waiver.

---

[15]Amici move that we exclude this evidence because it is not "properly part of the record." The photographs and diary material were admitted on Dodd's motion, without objection by any party, and it did not influence the trial court or this court. The material is part of the record. RAP 9.1.

3. The record establishes that Dodd is competent to waive general appellate review: He is capable of understanding the choice between life and death and knowingly and intelligently waiving all rights to appeal. We accept Dodd's waiver of his right of general appellate review.

4. The amici admitted in open court that Dodd was competent and fully capable of waiving general appellate review.

5. Sufficient evidence supports the jury's sentence of death for Dodd. That sentence is not disproportionate to the sentence imposed in similar cases, and it was not the result of passion or prejudice.

We affirm the sentence of death.

BRACHTENBACH, DOLLIVER, DURHAM, GUY, and JOHNSON, JJ., concur.

ANDERSEN, J. (concurring) — I concur in the majority opinion's conclusion that a defendant in a capital case may waive his or her right of general review and in the further conclusion that the jury's sentencing decision in this case should be sustained.

I write separately only to make clear that once a competent defendant has knowingly made the decision to waive his or her right to introduce mitigating circumstances, an appellate court may *not* hear and weigh mitigating circumstances first offered during the appeal process.

The majority opinion notes that the defendant Dodd chose not to present mitigating evidence, but then goes on to list the evidence amici believe would have been offered. Majority opinion, at 25. The majority opinion properly notes that the mere presence of mitigating factors does not require leniency, but then states "[t]he jury correctly concluded here that the aggravating circumstances of this crime overwhelm any mitigating factors." Majority opinion, at 25. The problem is that this jury did not hear any mitigating factors and to the extent this implies that we should review the jury's decision *as if* the proffered mitigating evidence had been

heard, I disagree; there is no basis in the law for such an approach. Since we would not allow a defendant to first raise mitigating circumstances on appeal, I fail to see why this court should consider mitigating evidence amici think would have been offered.

UTTER, J. (dissenting) — Mr. Dodd has expressed his wish to die, to waive all appeals and have us only make the determinations required by RCW 10.95.130(2). His expressions are clear, and he is legally competent. His clearly expressed wish to die places this case in stark contrast to other cases where defendants have expressed a desire to continue their lives, even if in prison without possibility of parole. What is the effect of Mr. Dodd's declarations on the processes of this state and court?

Mr. Dodd's wishes, while entitled to some weight, are not determinative. Our death penalty statute requires us to review every death sentence on the record. RCW 10.95.100. In addition, there are several important policy reasons why allowing Dodd to waive his general appeals would be unwise. First, there is the possibility that Dodd may change his mind between now and the execution. Second, society has a significant interest in the nonarbitrary application of the death penalty. To give paramount weight to Mr. Dodd's desires would, in effect, mean that the State is participating in Mr. Dodd's suicide. *Lenhard v. Wolff*, 444 U.S. 807, 811, 62 L. Ed. 2d 20, 100 S. Ct. 29 (1979) (Marshall, J., dissenting). Therefore, I believe we must review the arguments raised by amici curiae.

Amici have raised many significant claims that the majority will not consider. Amici argue (1) the trial court committed error by admitting portions of Dodd's diary; (2) the trial court gave the jury instructions which violated the state and federal constitutions; (3) Dodd's confession and physical evidence should not have been admitted during the sentencing phase; (4) failure of Dodd's trial counsel to present mitigating evidence violated the Sixth and Eighth Amendments to the

federal constitution; and (5) Dodd's death sentence should be reversed under RCW 10.95.130(2).

# I
## WAIVER OF GENERAL APPEAL

The majority hastily concludes that the Legislature has approved the waiver of appeals in capital cases. Its reading of RCW 10.95 is unpersuasive. It also fails to address important policy reasons why we should not recognize a capital defendant's right to waive his right to appellate review. Finally, allowing such a waiver raises serious problems under our federal and state constitutions. Therefore, I would hold that Mr. Dodd cannot waive his right to general appellate review.

# A
## RCW 10.95

The majority opinion correctly notes that Washington's death penalty statute requires us to review a capital defendant's sentence. RCW 10.95.100. It erroneously concludes, however, that the Legislature intended to allow capital defendants to limit the scope of appellate review of their sentences. I cannot infer that the Legislature wished to allow capital defendants to waive such an important right.

Under RCW 10.95.100, we are required to review all capital defendants' sentences:

> Whenever a defendant is sentenced to death, upon entry of the judgment and sentence in the trial court the *sentence shall be reviewed* on the record by the supreme court of Washington.

(Italics mine.) Nothing in RCW 10.95.100 suggests the scope of sentence review is limited.

The majority infers that the Legislature intended to allow capital defendants to waive their right to general appeals from the language of RCW 10.95.130(1) and .150:

> The sentence review required by RCW 10.95.100 shall be in addition to *any* appeal.
> In all cases in which a sentence of death has been imposed, *the appellate review, if any*, and sentence review . . ..

(Italics mine.) A more plausible interpretation of the words which the majority places so much emphasis on is that the

Legislature was distinguishing appellate review of the sentence from other appeals. Appellate sentence review is mandatory. Other appeals, such as those arising from the guilt portion of a bifurcated capital trial, are not. While RCW 10.95.100 expressly requires us to review the sentence, there is no similar mandatory requirement that errors from the guilt phase be reviewed.

Neither of the passages cited by the majority mention waiver, nor do they suggest review of capital sentences is largely optional. The majority's statutory argument for waiver is tenuous at best. Of course, if the Legislature wants to amend RCW 10.95 to authorize such waivers, it is free to do so, subject to constitutional limitations.

A recent Arizona case, *State v. Brewer*, 170 Ariz. 486, 826 P.2d 783 (1992), supports my reluctance to conclude the scope of review under RCW 10.95 is as limited as the majority insists. In *Brewer*, the State argued that defendant's waiver of appeal vastly narrowed the scope of appellate review. It relied on Ariz. Rev. Stat. Ann. § 13-4035(A), which provides that "the supreme court shall review all rulings affecting the judgment" in a capital case. The State argued that the statute only required the court to review capital cases for fundamental error in the guilt phase, not the sentencing phase. The Arizona Supreme Court rejected the State's argument, recognizing the gravity of the death penalty, and its corresponding obligation to review the sentence. *Brewer*, at 492-94. *See also Evans v. State*, 361 So. 2d 666, 667 (Ala. 1978) (holding that State's dominant and overriding interest in insuring the death penalty is imposed only for utmost of compelling legal reasons required appellate review).

While it is true that RCW 10.95.130(2) requires this court to make three determinations during its sentencing review, it contains no suggestion that this court's mandatory sentence review is limited to those three issues. It does not circumscribe the scope of mandatory sentence review under RCW 10.95.100.

Even if one concedes that we are only required to consider the three issues posed in RCW 10.95.130(2), the majority adopts an unduly narrow view of our responsibility in addressing those issues. The three questions posed in RCW 10.95.130 are:

(a) Whether there was sufficient evidence to justify the [sentence of death]; and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. . . .; and

(c) Whether the sentence of death was brought about through passion or prejudice.

Unfortunately, the majority fails to realize that we cannot truly answer these questions unless we resolve the significant evidentiary and constitutional challenges raised by amici. For example, we cannot answer the question of whether there was sufficient evidence to justify a death sentence without first determining what evidence was properly before the jury. Therefore, we must consider amici's claims that portions of Dodd's diary should not have been admitted, that his confession and physical evidence should not have been admitted, and that his counsel's failure to present mitigating evidence violated the federal constitution. In addition, whether or not the diary excerpts should have been admitted is relevant for the question of whether passion or prejudice affected the jury's decision. RCW 10.95.130(2)(c). Nonetheless, the majority interprets these three questions narrowly, and fails to answer them adequately.[16]

---

[16]The concurrence takes an even more circumscribed view of our duty under RCW 10.95.130(2) by arguing we should not consider mitigating evidence that was not presented to the jury. It fails to note juries are supposed to weigh aggravating and mitigating evidence in answering the question posed in RCW 10.95.060(4). Where the jury did not have the opportunity to consider the mitigating evidence, it is appropriate that we at least perform that task. In fact, it is precisely such weighing that makes Washington's death penalty meet Eighth Amendment requirements. *See Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976) (approving Georgia's revised death penalty statute which created a sentencing proceeding where the finder of fact weighs aggravating and mitigating circumstances to determine whether death is the appropriate penalty). Where the

To summarize, I differ with the majority's conclusion that the language of RCW 10.95 allows capital defendants to limit the scope of appellate review of their sentences. RCW 10.95.100 requires us to review every death sentence on the record. I also find that review of all the errors raised by amici is necessary to answer the questions posed in RCW 10.95.130.

## B
### The Public Policy for Not Allowing Waiver

Public policy, as well as the state and federal constitutions, compel me to conclude that a capital defendant cannot waive or limit the scope of appellate review of a death sentence. First, there exists the serious possibility that capital defendants may change their minds about whether they want appellate review. Second, the societal interests at stake are simply too great to give effect to a waiver. Finally, waiver of appellate review in a capital case is highly questionable under both the federal and state constitutions.

Although Dodd's attempt to waive his appeals creates an issue of first impression for this court, we are likely to see many more cases in which capital defendants seek execution. It is common for those on death row to express a will to stop their appeals and proceed with execution. Most change their minds and agree to continue the appeals process. Note, *Ethical Choices for Attorneys Whose Clients Elect Execution*, 3 Geo. J. Legal Ethics 799, 800 (1989-1990). Given the physical and psychological pressures felt by those on death row, the lure of ceasing to resist the death penalty may be as

---

jury has not had the opportunity to consider mitigating evidence, our statute, as well as the Eighth Amendment, require weighing of all aggravating and mitigating circumstances.

In effect, the concurrence would allow capital defendants who want to die to undermine our statutorily mandated review responsibility under RCW 10.95-.130(2). The results could be disastrous in future cases. Under the concurrence's view, we would allow capital defendants to be put to death simply because they wanted to die, even when significant mitigating evidence was available, but not presented to the jury. In effect, we would be sanctioning state-assisted suicide.

great for the innocent[17] as for the guilty. Strafer, *Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention,* 74 J. Crim. L. & Criminology 860, 869 (1983).[18] Since the United States Supreme Court approved the revised death penalty laws in 1976, over 10 percent of the executions carried out in this country have been of those who elected to die. Note, at 800. Therefore, we must be sensitive to the fact that our decision in this case may control the outcome in many future death penalty cases.

The majority places undue weight on Dodd's desire to be executed. It may be that Dodd will change his mind. The majority fails to mention that those who have "volunteered" for execution have sometimes vacillated between vigorously pursuing their appeals and resisting efforts to prevent their executions. White, *Defendants Who Elect Execution,* 48 U. Pitt. L. Rev. 853, 854-55 (1986-1987). For example, John Louis Evans pleaded guilty to murder and demanded the death penalty at his penalty trial, threatening to kill again if it was not imposed. After the jury imposed the death penalty, he opposed all appeals on his behalf. Subsequently, however, Evans changed his mind and sought unsuccessfully to have his conviction and sentence overturned by the courts. White, at 855; *see also* Streib, *Executions Under the Post-*Furman *Capital Punishment Statutes: The Halting Progression From "Let's Do It" to "Hey, There Ain't No Point*

---

[17]It is not uncommon for innocent people to be convicted and sentenced to death. *See* Bedau & Radelet, *Miscarriages of Justice in Potentially Capital Cases,* 40 Stan. L. Rev. 21 (1987-1988) (presenting 350 cases in which defendants convicted of capital or potentially capital crimes in this century, and in many cases sentenced to death, have later been found to be innocent).

[18]Self-destructive individuals may actually commit crimes to have the State become the mechanism for their suicide. White, *Defendants Who Elect Execution,* 48 U. Pitt. L. Rev. 853, 871-75 (1986-1987); Strafer, at 864-66; Solomon, *Capital Punishment as Suicide and as Murder,* in *Capital Punishment in the United States* 432, 433-35 (1976). By approving what amounts to short-order, state-assisted suicide in this case, we may actually be creating an incentive, rather than a deterrent, for some individuals to commit crimes.

*in Pulling so Tight"*, 15 Rutgers L.J. 443, 460-63 (1983-1984). Another capital defendant, Jack Howard Potts, changed his mind numerous times about whether he wanted to seek review of his death sentence. *Potts v. Zant*, 638 F.2d 727, 730-35 (5th Cir.), *cert. denied*, 454 U.S. 877 (1981).[19]

Because a capital defendant's desire to die may change, it should not be an adequate basis for us to abandon our obligation to perform general appellate review. At least one thorough review should occur to insure that the State does not improperly inflict the gravest of punishments. *See State v. Hightower*, 214 N.J. Super. 43, 45-46, 518 A.2d 482 (1986) (refusing to allow defendant to waive review of sentence in part because defendant could change his mind).

To do otherwise would be to enshrine the concept of waiver. As the Pennsylvania Supreme Court so aptly wrote:

> It is evident from the record that Gerard McKenna personally prefers death to spending the remainder of his life in prison. While this may be a genuine conviction on his part, the waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence. Especially is this so where, as here, to do so would result in state aided suicide. The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue — the propriety of allowing the state to conduct an illegal execution of a citizen.

(Footnote omitted.) *Commonwealth v. McKenna*, 476 Pa. 428, 441, 383 A.2d 174, 181 (1978).

Given the high stakes involved — society's taking of life — there are serious problems with allowing waiver. Judicial acceptance of a waiver depends in large part on the sig-

---

[19]One advocate of capital defendants' right to personal autonomy and choice suggests that death row inmates should be free to change their minds at any time about the propriety of review and should be entitled to appellate review when and if they desire it. Note, *Death Row Right to Die: Suicide or Inmate Decision?*, 54 S. Cal. L. Rev. 575, 627 (1980-1981). The author, however, fails to acknowledge the disorder and extra costs such vacillation could create for our court system. The facts of *Potts*, where the capital defendant repeatedly changed his mind about whether or not to appeal his death sentence, aptly illustrate what a farce this can create. It is much more sensible for us to engage in a single, thorough review of a capital defendant's death sentence at the outset.

nificance of the right being waived. Comment, *Capital Punishment and the Waiver of Sentence Review*, 18 Harv. C.R.-C.L. L. Rev. 483, 496 (1983). Important social interests often preclude waiver of individual rights. Comment, 18 Harv. C.R.-C.L. L. Rev. at 504-08.[20] Society's interest in the non-arbitrary application of the death penalty is of fundamental importance.

The majority's analysis is flawed because it fails to realize the significance of the rights Mr. Dodd wishes to waive. The United States Supreme Court has repeatedly asserted that "because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case' ". *Zant v. Stephens*, 462 U.S. 862, 884-85, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983) (quoting *Woodson v.*

---

[20]For example, capital defendants generally cannot waive the right to be present at trial. *Hopt v. Utah*, 110 U.S. 574, 579, 28 L. Ed. 262, 4 S. Ct. 202 (1880); *Lewis v. United States*, 146 U.S. 370, 36 L. Ed. 1011, 13 S. Ct. 136 (1892); *Hall v. Wainwright*, 733 F.2d 766, 775 (11th Cir. 1984), *cert. denied*, 471 U.S. 1107 (1985); *Profitt v. Wainwright*, 685 F.2d 1227, 1257-58 (11th Cir. 1982), *cert. denied*, 464 U.S. 1002 (1983); *Bustamante v. Eyman*, 456 F.2d 269, 274 (9th Cir. 1972) (stating that defendant "did not, indeed could not, waive his right to be present in the courtroom at trial"); *Near v. Cunningham*, 313 F.2d 929, 931 (4th Cir. 1963). *But cf. Campbell v. Blodgett*, 978 F.2d 1502 (9th Cir. 1992) (holding that capital defendant, who wished to prepare himself for trial, could waive presence during jury selection).

The public's interest in the integrity of capital proceedings also limits many other choices of capital defendants. For example, the Seventh Circuit stated in *United States v. Taylor*, 569 F.2d 448, 452 (7th Cir.), *cert. denied*, 435 U.S. 952 (1978):

It does not inevitably follow, however, that this right of self-representation comprehends any correlative right to preclude the trial court from appointing counsel and authorizing him to participate in the trial over the accused's objection in order to protect the public interest in the fairness and integrity of the proceedings.

*See also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980) (holding that public's right to receive information about criminal justice system restricted the ability of the defendant to waive his Sixth Amendment right to a public trial); *Singer v. United States*, 380 U.S. 24, 13 L. Ed. 2d 630, 85 S. Ct. 783 (1965) (upholding restrictions on a defendant's right to waive trial by jury).

*North Carolina,* 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978, 2991 (1976)); *see also Gardner v. Florida,* 430 U.S. 349, 358, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977). *Gregg v. Georgia,* 428 U.S. 153, 187, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976); *Lockett v. Ohio,* 438 U.S. 586, 605, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). Appellate review is not only critical to insure reliability of a death sentence, but also its constitutionality. As the Court wrote in *Zant*: "[A]lthough not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." 462 U.S. at 885.

The only positive thing one could say about the majority's position that Mr. Dodd can waive his right to appellate review is that it respects his autonomy. But is autonomy the right word? In his brief to this court, Mr. Dodd described what he did during his previous encounters with the law: "I manipulated the system to my advantage." Brief of Appellant, at 24. A review of the record in this case indicates that Dodd has done the same thing in this case once he decided he wanted the death penalty.[21] Weighing Mr. Dodd's desires against those of society in the reliable, nonarbitrary application of the death penalty, I find society's interest in the reliability of a death determination more significant.

To summarize, sound reasons exist for us not to accord undue weight to Mr. Dodd's desire to waive his appeals. Even if we assume that Mr. Dodd's desire to die will be unwavering, future capital defendants are not so likely to remain constant in their desire to end their lives. In addition, the importance of society's interests in the reliable application of the ultimate penalty — death — makes waiver untenable. Absent a more clear statement by the Legislature, we should not allow capital defendants to waive their right to appeal.

---

[21]For example, during Dodd's competency hearing, he introduced highly prejudicial excerpts from his diary, so that it could be part of the record on review. Even the trial court had excluded them.

## C
### Federal and State Constitutions

Sound public policy alone dictates that we should not allow waiver. We need not even engage in constitutional analysis. Nonetheless, I write briefly on the federal and state constitutional issues raised by Dodd's waiver to expose the serious weaknesses of the majority's position.

First, the United States Supreme Court has not expressly stated that a capital defendant can waive the right to appellate review. In both *Whitmore v. Arkansas*, 495 U.S. 149, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990) and *Gilmore v. Utah*, 429 U.S. 1012, 50 L. Ed. 2d 632, 97 S. Ct. 436 (1976), a majority of the Court considered the propriety of third party standing to challenge a death sentence. In both opinions, the Court expressly stated that it was not addressing the issue of whether the Eighth Amendment prohibits giving effect to a capital defendant's desire to waive all appeals. *Whitmore*, at 155; *Gilmore*, at 1017. As noted above, appellate review is essential to achieve a reliable, nonarbitrary result in capital cases. Therefore, it is a prerequisite for the death penalty to be constitutionally valid.

In addition, the majority's state constitutional analysis is wholly inadequate. It mechanically applies the factors we set forth in *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Only cursory mention is given to our decision in *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984), where we struck down several portions of RCW 10.95 as violative of both the Eighth Amendment and the more extensive protections of Const. art. 1, § 14. In *Bartholomew*, we wrote:

> Since the death penalty is the ultimate punishment, due process under this state's constitution requires stringent procedural safeguards so that a fundamentally fair proceeding is provided.

101 Wn.2d at 640. The majority ignores the fact that appellate review is precisely the type of procedure which insures a death penalty determination was fair. Without appellate review of the sentencing phase of a capital case, the State

could, for example, violate evidentiary rules with impunity. This would contravene *Bartholomew* and undermine the reliability of a death penalty determination. Therefore, contrary to the majority opinion, waiver of appellate review by a capital defendant raises serious federal and state constitutional issues.

## II
### FAILURE TO PRESENT MITIGATING EVIDENCE

Although each of amici's assignments of error should be given thorough review by this court, I focus on the failure of Dodd's counsel to present mitigating evidence for two reasons. First, the failure to present such evidence raises serious Sixth and Eighth Amendment implications. Second, it is the type of issue that is likely to resurface the next time a capital defendant decides he or she wants to die at the hands of the State.

There is a serious possibility in this case that Dodd's desire to die, not sound tactical strategy, was behind the decision not to present mitigating evidence. I would remand this case so the trial court can determine whether the failure to present mitigating evidence was based on Mr. Dodd's desire to die or was a tactical decision.

## A
### Eighth Amendment Requirements

The United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) decided that existing death penalty statutes violated the Eighth Amendment's ban on cruel and unusual punishment. Justice White aptly summed up the problem with the death penalty statutes as they existed in 1972, when he wrote that they lacked a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." 408 U.S. at 313 (White, J., concurring). A few years later, the Court in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976) approved Georgia's revised death penalty statute which created a separate sentencing proceeding where the finder of fact weighs aggravating and mitigating circumstances to determine whether death is the appropriate

penalty. In particular, the consideration of aggravating and mitigating circumstances serves an important function by channeling jury discretion. *Gregg*, 428 U.S. at 197 (Stewart, J., plurality).

The presentation of both aggravating and mitigating circumstances is necessary for the jury to make an individualized determination that the death penalty is the appropriate penalty. *Eddings v. Oklahoma*, 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). Without this critical information, the jury cannot make an informed, reliable determination. The Court has repeatedly recognized the importance of the presentation of mitigating evidence during the sentencing phase of a capital case. *See Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986) (holding that capital defendant had right to present all relevant mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 606, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (overturning Ohio's death penalty law which allowed consideration of only three types of mitigating evidence).

Indeed, withholding mitigating evidence undermines the jury's ability to consider the pivotal question it is supposed to consider during its deliberations: " 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?' " RCW 10.95.060(4). As the California Supreme Court wrote:

> To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated.

*People v. Deere*, 41 Cal. 3d 353, 364, 710 P.2d 925, 931, 222 Cal. Rptr. 13 (1985);[22] *State v. Koedatich*, 112 N.J. 225, 331-

---

[22]Although not expressly overruled, the California Supreme Court has subsequently disapproved of *Deere*. *See People v. Lang*, 49 Cal. 3d 991, 782 P.2d 627, 264 Cal. Rptr. 386 (1989); *People v. Bloom*, 48 Cal. 3d 1194, 774 P.2d 698, 259 Cal. Rptr. 669 (1989).

32, 548 A.2d 939, 994-95 (1988), *cert. denied*, 488 U.S. 1017 (1989).

The reasons I stated for not allowing Dodd to waive his right to appeals are equally applicable to his decision not to present any mitigating evidence. Even if Dodd did not want mitigating evidence presented during the penalty phase, his wishes are not necessarily determinative. The State also has an "interest in a reliable penalty determination". *Deere*, at 364; *Koedatich*, at 329-36; *State v. Hightower*, 214 N.J. Super. 43, 518 A.2d 482 (1986).[23] "The integrity of the criminal justice system in the non-capricious imposition of the death penalty is subverted if a defendant can choose the penalty regardless of the merits." Carter, *Maintaining Systemic Integrity in Capital Cases: The Use of Court-Appointed Counsel to Present Mitigating Evidence when the Defendant Advocates Death*, 55 Tenn. L. Rev. 95, 107, 144 (1987-1988). As Justice Linde of the Oregon Supreme Court wrote so eloquently:

> The demand for certainty has other roots than sympathy for a convicted murderer, as sometimes seems to be thought. The higher statutory and constitutional standards for capital cases also reflect the fact that executions at the hand of a state's public officials implicate the state's citizens in an act that many find morally repugnant. It therefore is not a defendant's privilege . . . to prevent an adequate test of the prosecution's case for the death sentence, as defendant did in this case.

*State v. Wagner*, 305 Or. 115, 217-18, 752 P.2d 1136, 1199 (1988) (Linde, J., dissenting), *vacated and remanded*, 492 U.S. 914 (1989).

The failure to present mitigating evidence during the sentencing phase of a capital case causes additional problems.

---

[23]At least one state court' has held that simply affording a defendant an "opportunity" to present mitigating evidence is sufficient to meet the Eighth Amendment's standards. *See Bishop v. State*, 95 Nev. 511, 516, 597 P.2d 273, 276 (1979). This position is untenable. It is the individual consideration of each defendant and the circumstances of each case that the Court has found sufficiently channels the factfinder's discretion to meet constitutional requirements. As the Court wrote in *Eddings*, "capital punishment must be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). The sheer magnitude of society's interest should outweigh the choice of the capital defendant.

First, it undermines our statutorily mandated duty to conduct proportionality review. RCW 10.95.130(2)(b); *see State v. Hightower*, 214 N.J. Super. 43, 46, 518 A.2d 482 (1986). Second, it creates a serious dilemma when a defendant changes his or her mind about desiring the death penalty. Either we must conclude that the defendant is stuck with an unfavorable trial record, or require a new trial. The first option seems unfair; the second, too costly. Requiring presentation of mitigating evidence at the outset would be preferable.

## B
### Eighth Amendment Is the Appropriate Focus

It would be problematic for us to view the failure to present mitigating evidence in this case as solely an issue of ineffective assistance of counsel. The California court in *Deere* found that failure to present such evidence constituted ineffective assistance of counsel. *Deere*, at 364. It insisted that lawyers do not fulfill their ethical and legal obligations by simply acting as "mouthpieces" for their clients. *Deere*, at 364. The California court stated that attorneys representing capital defendants have a duty to present mitigating evidence regardless of their clients' wishes. While this solution has some appeal, I believe the California court's opinion simplifies the serious dilemma faced by attorneys representing capital defendants who insist that they want no mitigation evidence presented. *See* Note, *Ethical Choices for Attorneys Whose Clients Elect Execution*, 3 Geo. J. Legal Ethics 799, 806-10 (1989-1990) (discussing the ethical problems attorneys encounter when their clients facing the death penalty decline to present mitigating evidence).

Justice Broussard, concurring in *Deere*, suggested a solution which appropriately balances the capital defendants' interests in autonomy and society's interest in a reliable penalty determination. He expressed his hesitation to describe the situation where a capital defendant prohibits his counsel from presenting mitigating evidence as an ineffective assistance of counsel problem. 41 Cal. 3d at 369. He noted the conflicting roles society expects counsel to play under such a

situation. On the one hand, "[t]he constitutional right to the effective assistance of counsel belongs to defendant personally." 41 Cal. 3d at 369. Simply stated, counsel has a duty to abide by a capital defendant's wishes. On the other hand, society prescribes yet another role for counsel: to present mitigating evidence necessary to insure the reliability of the penalty determination. Justice Broussard noted the trouble when these roles conflict:

> But the fact that the state assigns defense counsel a role which may require him to act contrary to his client's wishes on a matter of such vital importance to the client presents a troubling picture. The defense of a capital case often requires a close and trusting relationship between counsel and client; yet our decision requires counsel to violate that trust, to take a position against his client, and perhaps to present evidence revealed to him in confidence by his client.

41 Cal. 3d at 369. I agree with Justice Broussard's reluctance to consider this solely as an ineffective assistance of counsel issue. The more appropriate approach is to characterize this as an Eighth Amendment problem. *See* Carter, at 116 (arguing that focusing solely on the Sixth Amendment "ignores the competing eighth amendment concern of whether the death penalty is unconstitutionally cruel and unusual").

More recently, the New Jersey Supreme Court in *Koedatich* adopted Justice Broussard's reasoning. As the New Jersey court noted in *Koedatich*, at 332, an attorney representing a death row inmate who opposes presentation of mitigating evidence is in an untenable position. Generally, a lawyer is supposed to "abide by a client's decisions concerning the objectives of representation". RPC 1.2(a). In this situation, however, following the client's wishes may result in the client's execution.

The New Jersey Supreme Court recognized that a serious anomaly occurs when we try to apply the standards for ineffective assistance of counsel set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) to a case

where defense counsel follows a capital defendant's decision not to present any mitigating evidence:

> Applying *Strickland-Fritz* [*State v. Fritz*, 105 N.J. 42, 519 A.2d 336 (1987)] to this case, we do not find that defense counsel's conduct was anything but reasonable; he was, after all, adhering to ethical canons by following his client's instructions. Application of the *Strickland* standard to this situation, in short, results in an anomaly: defense counsel's conduct was reasonable, but the result of that conduct was prejudicial. In our view, it is simply the wrong standard to apply.

112 N.J. at 335. Instead, the court focused on the Eighth Amendment and concluded that mitigating factors must be introduced regardless of the defendant's position. 112 N.J. at 336. *See also* Carter, at 136-42. We too should focus on the Eighth Amendment's requirements, and conclude that mitigating evidence must be presented regardless of Mr. Dodd's desire to die.

In doing so, I am not advocating that there is a per se obligation to present mitigating evidence in capital cases. We must generally be highly deferential to a counsel's judgment. *Strickland*, 466 U.S. at 689. Attorneys for capital defendants may make a reasonable strategic decision that presentation of some mitigating evidence may be more harmful than beneficial. *Burger v. Kemp*, 483 U.S. 776, 793-95, 97 L. Ed. 2d 638, 107 S. Ct. 3114 (1987).

Capital defendants also have some role in determining what mitigating evidence is presented. As the Court in *Strickland* stated:

> Counsel's actions are usually based, quite properly, on informed *strategic* choices made by the defendant and on information supplied by the defendant.

(Italics mine.) *Strickland*, 466 U.S. at 691, *quoted in In re Jeffries*, 110 Wn.2d 326, 333, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988). Therefore, only strategic choices of the capital defendant should be given weight in a capital proceeding. A defendant's desire to die should not unduly interfere with the reliability of sentencing.

In this case the trial record does not indicate whether Dodd's attorneys in fact made a tactical decision not to

present mitigating evidence at the sentencing phase. In fact, the record suggests Dodd may have insisted that *no* mitigating evidence be presented for reasons wholly unconnected with strategic choices, and that his attorneys simply acceded to Mr. Dodd's wishes.[24]

While it is true that some of the mitigating evidence the defense counsel could have presented would have opened the door to damaging rebuttal from the State, there was significant mitigation evidence that does not appear to have posed such a risk. See Declaration of Teresa A. McMahill. For example, the majority fails to mention the interview with Dodd's sister, Ms. Katherine Dodd Cox. The notes from her interview indicate she could have testified about Dodd's difficult childhood and her continuing love for her brother. She also appears to have been very willing to testify on Dodd's behalf. In addition, the notes from the interviews with Dodd's father, Westley James Dodd, also indicate he could have provided significant mitigating testimony. His father also could have testified about Dodd's childhood, the family's history of mental illness, and his love for his son.

Dodd's band instructor from middle school, Larry Bunch, was also willing to testify on Dodd's behalf. He found Dodd mature, reliable, and dependable, and always found Dodd did "above and beyond what was needed at school." Interview with Larry Bunch, at 1. Mr. Bunch stated:

> I really liked Wes, and thought highly of him. I think he shouldn't be let out, but I don't want him executed. There are too many good things about the guy.

Interview with Larry Bunch, at 2. Such mitigating evidence would have been essential to "portray the defendant as a

---

[24]The following line of questions from the competency hearing suggests that Dodd alone, not his attorneys, made the determination not to present mitigating evidence:

"Q: Here's a case, *Jeffries*, the defense attorney didn't call certain witnesses.
"A: I would waive that as an issue.
"Q: But you didn't call any witnesses on your death penalty case, your attorneys just sat there like bumps on a log.
"A: Unwillingly.
"Q: Why did they do that?
"A: Because that's what I told them they would do." Verbatim Report of Proceedings (June 5, 1991), at 118-19.

human being with positive qualities." Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 335 (1983). Admittedly, some of the mitigating evidence Dodd could have presented would have prompted rebuttal testimony from the State. But it is not clear that this determined the choice not to present any mitigating evidence from a strategic standpoint. We should remain mindful that mitigating evidence need only have persuaded one juror for Dodd to have received life without parole rather than the death penalty.

While an attorney must generally follow the wishes of his client, there is also a strong public interest in the reliability of a death penalty determination. Therefore, Dodd could not prohibit presentation of all mitigating evidence unless he and his attorneys agreed that there were bona fide tactical reasons for not presenting it. I would remand this case to the trial court for a hearing to determine why Dodd's attorneys failed to present mitigating evidence, with particular emphasis on the issue of whether the decision was tactical.

If it was not a tactical decision, the State must engage in another sentencing proceeding if it wishes to seek the death penalty. There remains the issue of how such evidence should be presented to the finder of fact at such a proceeding if Dodd does not want it presented. To require defense counsel to present mitigating evidence over the objections of a capital defendant would be "anathema to the attorney-client relationship." Carter, at 136. Justice Broussard's reasoning suggests what may be helpful alternatives in *Deere*:

> Trial courts should explore methods of alleviating this conflict. In some cases it might be desirable for counsel, in addition to presenting mitigating evidence, to inform the jury of defendant's personal position. In other cases, the court might permit the defendant himself to address the jury. Alternatively, the court could call persons with mitigating evidence as its own witnesses, or appoint new counsel to call them, and thereby place on the record the mitigating evidence essential to a careful, balanced penalty determination.
>
> In sum, both the state's need to assure the fairness and reliability of the penalty determination, and defendant's rights to personal choice and dignity, command respect. It is essential that the penalty trial constitute a balanced presentation of aggravating and mitigating evidence, but this goal should be

achieved, as far as possible, with respect and accommodation for defendant's personal values and for his relationship with counsel.

*Deere*, at 369 (Broussard, J., concurring); *see also Koedatich*, at 336 (approving Justice Broussard's conclusion that trial courts must take steps to insure that mitigating factors are introduced); Carter, at 149-51 (proposing the appointment of an attorney whose specific role is to present mitigating evidence).

## III
### CONCLUSION

Although Dodd's crimes are gruesome, and he has expressed a desire to die, we must not let that obscure our duty to review his sentence. Society has a significant interest in the reliability of death penalty determinations. Therefore, both appellate review and presentation of mitigating evidence are necessary, regardless of a defendant's desire to die. To give Dodd's wishes paramount importance would be to sanction state assisted suicide.

Therefore, I would consider all of the issues raised by amici on Dodd's behalf. I believe the failure to present mitigating evidence may have violated the Eighth Amendment. Unless bona fide tactical reasons existed for presenting no mitigating evidence, the failure to present mitigating evidence raises serious problems with the reliability of a death penalty determination. It is not clear from the record whether Dodd and his attorneys made a tactical decision or whether Dodd, who desires to die, simply demanded that no mitigation evidence be presented. Therefore, I would remand this case to determine whether or not a tactical decision was made about the presentation of mitigating evidence.

SMITH, J., concurs with UTTER, J.

Reconsideration denied November 19, 1992.